**BUREAU OF ALCOHOL, TOBACCO AND FIREARMS, Western Region, Department of Treasury, San Francisco, Petitioner/Cross-Respondent,**

v.

**FEDERAL LABOR RELATIONS AUTHORITY, Respondent/Cross-Petitioner,**

**National Treasury Employees Union, Intervenor.**

Nos. 80–7673, 81–7021.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 11, 1982.

Decided March 22, 1982.

Rehearing and Rehearing En Banc Denied July 13, 1982.

Douglas N. Letter, Washington, D. C., argued, for petitioner/cross-respondent; William Kanter, Washington, D. C., on brief.

Steven H. Svartz, John F. Bufe, Washington, D. C., on brief, for respondent/cross-petitioner; Elizabeth Medglia, Washington, D. C., on brief.

Before DUNIWAY and CANBY, Circuit Judges, and HALBERT,* District Judge.

HALBERT, District Judge:

The Bureau of Alcohol, Tobacco, and Firearms (ATF) petitions for review of a Federal Labor Relations Authority (FLRA) finding of an unfair labor practice under Title VII of the Civil Service Reform Act, 5 U.S.C. § 7101 *et seq.* The FLRA cross-petitions for enforcement of its order requiring ATF to pay its employee, Pruett, official time, travel expenses, and per diem for time spent negotiating the effect of a proposed change in location of an ATF facility.

## I. *Facts*

The facts are not in dispute. In November of 1978, ATF notified the National Treasury Employees Union (Union) that it intended to move its Lodi, California office to Sacramento and establish a reduced duty post at another location in Lodi. The Union wanted to negotiate the move and designated Donald Pruett, an ATF employee, as its representative. Pruett lived in Madera, California, and worked at the ATF office in Fresno.

It was agreed that Pruett and ATF officials would meet at the proposed Sacramento facility on February 23, 1979. They examined that facility, then drove to the new Lodi facility to view it. Eventually, they went to the existing Lodi offices to discuss the impact the moves would have on bargaining unit members and to negotiate matters such as parking facilities, assignment of certain employees, and excused tardiness for the first week in the Sacramento facility. The agreements reached were memorialized in a letter.

The existing collective bargaining agreement between ATF and the Union provided for quarterly meetings for which union representatives would be granted official time. Pruett sought to have the February 23 meeting classified as such, but ATF denied the request. Pruett was told that he could take either leave without pay or annual leave for the day.

As a result of ATF's actions, the Union filed an unfair labor practice charge in June of 1979 and the FLRA General Counsel issued a complaint in January 1980. That complaint charged that ATF's failure to

---

* Honorable Sherrill Halbert, United States District Judge, Eastern District of California, sitting by designation.

count the February 23 meeting as official time was an unfair labor practice under 5 U.S.C. § 7116(a)(1), (a)(8). (The complaint was amended at the administrative hearing to include charges concerning travel and per diem expenses.)

The administrative law judge's determination that an unfair labor practice had been committed was based on an Interpretation and Guidance issued by the FLRA in December of 1979. That Interpretation stated that Title 5, United States Code, Section 7131(a) mandated the authorization of official time for all collective bargaining negotiations, and that if representatives were entitled to official time they were also entitled to travel and per diem reimbursements. *See* 44 Fed.Reg. 76581 (Dec. 27, 1979). The administrative law judge therefore ordered ATF to pay Pruett the appropriate sums and to post a notice indicating that ATF would grant official time and make travel and per diem payments to union representatives engaged in midterm bargaining negotiations. The FLRA affirmed that finding in September 1980.

## II. *Analysis*

### A. *Standard of Review*

Review of a decision of the FLRA shall be on the record in accordance with 5 U.S.C. § 706, *see* 5 U.S.C. § 7123(c), and the agency's action shall be set aside only if arbitrary, capricious, an abuse of discretion, or otherwise contrary to law. *Id.* § 706(2)(A). In the case at bar, if the FLRA's Interpretation and Guidance is found to be a reasonable interpretation of the law, the FLRA decision is clearly not arbitrary and capricious. It is therefore necessary to focus our attention on the Interpretation and Guidance itself.

The FLRA has been granted the authority to promulgate rules and regulations under 5 U.S.C. § 7134. The Interpretation, however, does not appear to have been issued pursuant to that statute, although the FLRA did provide notice and an opportunity to comment. *See* 44 Fed.Reg. 42778 (July 20, 1979); *id.* at 76581 (Dec. 27, 1979). Rather, the Interpretation seems to have

been issued pursuant to 5 U.S.C. § 7105(a)(1), which requires the FLRA to provide leadership in establishing policies and guidelines and to take responsibility for carrying out the purpose of Title VII. As an interpretative rule, therefore, it may be accorded less weight than rules issued pursuant to the delegated rulemaking authority of Congress. *See General Electric Co. v. Gilbert*, 429 U.S. 125, 141, 97 S.Ct. 401, 410, 50 L.Ed.2d 343 (1976). The Supreme Court has stated that although interpretative rules reflect an agency's special expertise and are thus entitled to deference, their weight on judicial review will also depend on the thoroughness evident in their consideration, the validity of the reasoning, and their consistency with earlier and later pronouncements. *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944).

Since the Interpretation at issue merely expresses the agency's view on the meaning of existing law, based on examination of the legislative history and general purpose of Title VII, it does not have the force of law, but shall be given deference if reasoned and supportable. *See, e.g., Whirlpool Corp. v. Marshall*, 445 U.S. 1, 11, 100 S.Ct. 883, 890, 63 L.Ed.2d 154 (1980); *Magma Copper Co. v. Secretary of Labor*, 645 F.2d 694, 696 (9th Cir. 1981), *cert. denied*, ⸺ U.S. ⸺, 102 S.Ct. 475, 70 L.Ed.2d 247 (1981); *Montana Power Co. v. Environmental Protection Agency*, 608 F.2d 334, 345 (9th Cir. 1979). If an agency's construction of a statute is reasonably defensible, it should not be rejected simply because a court might prefer another view, *see Department of Defense v. FLRA*, 659 F.2d 1140, 1161 (D.C.Cir.1981), *cert. denied sub nom. AFGE v. FLRA*, ⸺ U.S. ⸺, 102 S.Ct. 1443, 71 L.Ed.2d 658 (1982), although an agency should not be permitted to usurp Congressional authority to make major policy decisions. *Ford Motor Co. v. NLRB*, 441 U.S. 488, 497, 99 S.Ct. 1842, 1849, 60 L.Ed.2d 420 (1979). It is our determination that the Interpretation and Guidance under

examination here is reasoned and supportable.

### B. The grant of official time for midterm collective bargaining negotiations

Title 5, United States Code, Section 7131(a) provides:

Any employee representing an exclusive representative in the negotiation of a collective bargaining agreement under this chapter shall be authorized official time for such purposes, including attendance at impasse proceedings, during the time the employee otherwise would be in a duty status. The number of employees for whom official time is authorized under this subsection shall not exceed the number of individuals designated as representing the agency for such purposes.

The question presented is whether that section authorizes "official time" for employee representatives during midterm negotiations, as opposed to the negotiation of a basic collective bargaining agreement. The FLRA found, based on an examination of the express language of the statute, legislative history, and public policy, that it does. We agree.

■ Turning first to the statutory language, we take note of the axiom that whenever the same word or phrase is used in different parts of a statute, it will be presumed to be used in the same sense throughout unless there is evidence of a contrary intent. *See, e.g., Northern Plains Resource Council v. EPA*, 645 F.2d 1349, 1355 (9th Cir. 1981); *Chugach Natives, Inc. v. Doyon, Ltd.*, 588 F.2d 723, 725 (9th Cir. 1978); *United States v. Gertz*, 249 F.2d 662, 665 (9th Cir. 1957). That rule is especially important in cases such as this, where the answer to our inquiry does not appear either on the face of the statute or in the legislative history.

■ Title VII defines "collective bargaining" as performance of the mutual obligation to meet at reasonable times and to bargain in a good faith effort to reach agreement with regard to conditions of employment,[1] 5 U.S.C. § 7103(a)(12), and a collective bargaining agreement is defined as an agreement entered into as a result of collective bargaining. *Id.* § 7103(a)(8). Furthermore, Section 7114(b)(3) provides that in order to fulfill the obligation to negotiate in good faith, agency and union representatives shall meet "as frequently as may be necessary." It is therefore clear that the reference to "negotiation of a collective bargaining agreement" in Section 7131(a) encompasses all situations in which agency and union representatives meet with the objective of conducting good faith negotiations concerning conditions of employment. The statute's application cannot be limited to the negotiation of basic agreements.

■ The legislative history of Title VII likewise supports the conclusion that official time is authorized for employee representatives conducting midterm bargaining. Title VII is for the most part a codification of Executive Order 11491[2], *reprinted in* 5 U.S.C. foll. § 7101. Section 20 of Executive Order 11491 allowed management and employees to negotiate grants of official time subject to certain limitations, and was interpreted by the Federal Labor Relations Council[3] to limit such grants of official time to the negotiation of basic agreements or management-initiated changes in working conditions. *See Local 2151, A.F.G.E., AFL–CIO, et al.*, F.L.R.C. 76A–106, 5 F.L.R.C. 373, 374, 375 (May 18, 1977).

When debating Title VII, however, Congress rejected language that would have preserved the limitation on authorization of official time to negotiations of basic agree-

---

1. "Conditions of employment" are defined as personnel policies affecting working conditions. *Id.* § 7103(a)(14). Therefore, the obligation to bargain in good faith clearly applies to these facts.

2. 5 U.S.C. § 7135(b) provides that the provisions of, *inter alia*, Executive Order 11491 shall remain in effect unless superseded by Title VII. Under the FLRA's reasoning, Section 7131(a) supersedes the Order's provision that grants of official time may be negotiated.

3. The Federal Labor Relations Council was the predecessor of the FLRA.

ments,[4] see S.Rep.No.95–969, 95th Cong., 2d Sess. 112, reprinted in [1978] U.S.Code Cong. & Ad.News 2723, 2834, enacting instead the language of Section 7131(a). ATF argues that since that section is silent with regard to official time for midterm negotiations, Congress evidently intended to preserve the restrictions of Executive Order 11491. The rejection of language that would have yielded that result persuades us that the FLRA reasonably concluded that Congress intended to enact an authorization of official time for midterm as well as basic collective bargaining agreements.

■ Congress' specific finding that collective bargaining in the federal service is in the public interest further aids this conclusion. See 5 U.S.C. § 7101(a). The FLRA has taken this a step further by reasoning that equalization of the positions of labor and management enhances the effectiveness of collective bargaining. The granting of official time for employee negotiators merely reflects the situation of government negotiators, who are commonly afforded official time for collective bargaining negotiations.

■ In short, we are unpersuaded by ATF's argument that the silence of the statute and legislative history requires us to assume that Congress intended to restrict the availability of official time for midterm negotiations. Congress had the clear opportunity to adopt language limiting official time to the negotiation of basic agreements. Its failure to do so, combined with the fact that a consistent reading of the statutory language indicates that "collective bargaining agreement" refers to both midterm and basic agreements, leads us to conclude that the FLRA's Interpretation and Guidance is reasoned and supportable on this point; hence, it will be given deference.

---

4. Section 7232 of the Senate version of the bill limited grants of official time to negotiations "relating to the negotiation or renewal of a basic collective bargaining agreement, as opposed to negotiations which arise out of circumstances during the term of the basic agree-

### C. Availability of travel expenses and per diem

The FLRA's determination that union negotiators are entitled to travel expenses and a per diem is based largely on its finding that Section 7131(a) authorizes official time for midterm negotiations. Once again, neither the statutory language nor the legislative history expressly refers to this question. The FLRA identified three factors that nevertheless appear to indicate that these expenses are authorized.

■ Analogous language to Section 7131(a) exists to support the conclusion that these reimbursements are warranted. Section 7131(c) states that the FLRA shall determine whether labor representatives in proceedings before the FLRA "shall be authorized official time for such purpose during the time the employee otherwise would be in a duty status." That language is nearly identical to language in Section 7131(a), and has been interpreted to mandate travel expenses and per diem any time the FLRA deems the presence of an employee necessary at FLRA proceedings. See 5 C.F.R. § 2429.13. It is therefore reasonable to conclude that both subsections should be given the same interpretation in this regard.

■ The FLRA mustered additional support for its position by observing that if union negotiators are on official time, they should be interpreted to be on official government business within the meaning of 5 U.S.C. § 5702(a). Employees on official government business are entitled to a per diem allowance for travel. See 5 U.S.C. § 5702(a). The FLRA buttressed its conclusion that labor representatives conducting collective bargaining negotiations are on official government business by citing 5 U.S.C. § 7101(a)(1)(B), in which Congress

---

ment (midcontract negotiations)." Furthermore, that section limited the amount of official time that could be authorized in any event to 40 hours or one-half the time spent in negotiations, and required that such grants be negotiated by the parties.

stated that collective bargaining in the civil service contributes to the effective conduct of public business. Thus, it appears that labor representatives should be treated similarly to other government employees conducting business for the government.

■ Congress' finding that collective bargaining is in the public interest also indicates that the positions of management and labor should be equalized with regard to collective bargaining, according to the FLRA. It is beyond argument that if union representatives are granted travel expenses and a per diem, their position would more nearly equal that of management representatives, who were found uniformly to be paid travel expenses and per diem. The statements of Congress to the effect that collective bargaining is favored by public policy reasonably support the FLRA's effort to equalize the positions of the parties to collective bargaining negotiations.

In light of the above, we find no merit to ATF's contentions that the availability of travel expenses and per diem will impair the willingness of union negotiators to reach agreement. A remedy for that eventuality is provided by Title VII's mandate of good faith negotiations and the availability of recourse to the Federal Service Impasses Panel. *See generally* 5 U.S.C. § 7119. We are unwilling to construe the FLRA's Interpretation and Guidance as a license for labor representatives to be dilatory and extravagant; actually, it appears that that Interpretation yields no more advantage to labor negotiators than that formerly possessed by management negotiators.

### III. *Conclusion*

The FLRA's Interpretation and Guidance is reasoned and supportable, and therefore will be given deference by this Court. The FLRA, acting in its own area of expertise, has interpreted the relevant language of Title VII in a clearly defensible manner, and we are neither permitted nor inclined to substitute a different judgment.

ATF's petition for review is denied, and the Order of the Federal Labor Relations Authority is ordered enforced.