CATHOLIC SOCIAL SERVICES, INC.; National Center for Immigrants' Rights, Inc.; United-California Mexican American Assoc.; American Federation of Labor-Congress of Industrial Organizations; United Farm Workers of America, AFL–CIO; La Communidad De San Juan; Sara Orantes De Palacios; Mercedes Aguilar De Lopez; Maria Teresa Reyes; Jose Guerrero Saravia; Efren Gonzalez; Lorenza Sanchez Benuto; Carlos Alberto Medina; Benjamin Chavez; Sergio Will; Eva Garcia De Soto; Petra Estrada De Vasquez, Plaintiffs,

v.

Edwin MEESE, III, Attorney General of the United States of America, Defendant.

No. Civ. S–86–1343 LKK.

United States District Court, E.D. California.

June 17, 1987.

Ralph Santiago Abascal, Stephen Rosenbaum, Jose R. Padilla, California Rural Legal Assistance, Inc., San Francisco, Cal., Ricardo Cordova, California Rural Legal Assistance, Inc., Modesto, Cal., for plaintiffs Aguilar de Lopez, Reyes, and Gonzalez.

Peter A. Schey, National Center for Imigrants' Rights, Inc., Los Angeles, Cal., for plaintiffs Saravia, Sanchez Benuto, Medina, United California Mexican-American Ass'n, National Center For Immigrants' Rights, Inc., United Farm Workers of America (AFL–CIO), Orantes Palacios, Chavez, de Soto and Estrado de Vasquez.

Elizabeth Sandoval Catholic Social Services, Inc., Centro Guadalupe Immigration Center, Sacramento, Cal., for plaintiffs Catholic Social Services, Inc., Centro Guadalupe Immigration Center, and Reyes.

Michael Rubin, Altshuler & Berzon, San Francisco, Cal., for American Federal of Labor-Congress of Indus. Organizations (AFL–CIO).

Robert Rubin, Ignatius Bau, National Refugee Rights Project, San Francisco Lawyers' Committee for Urban Affairs, Lynn H. Pasahow, Beth A. Finley, Patrick Broderick, Edward Lopez, McCutchen, Doyle, Brown & Enersen, San Francisco, Cal., for La Communidad de San Juan, Will.

David F. Levi, U.S. Atty., Glyndell Earl Williams, Sp. Asst. U.S. Atty., Sacramento, Cal., Lauri Steven Filppu, Deputy Director, Robert Kendall, Jr., Asst. Director, Linda B. Adams, Susan L. Kamlet, David V. Bernal, Attys., Office of Immigration Litigation, U.S. Dept. of Justice, Civ. Div., Washington, D.C., for defendant.

ORDER

KARLTON, Chief Judge.

The above-captioned matter is before the court on various motions brought by plaintiffs which are disposed of herein.[1] Only the motion for preliminary injunction requires extended discussion.[2] Moreover, even as to that motion, the parties have settled various issues,[3] and thus the sole remaining issue turns on the provisions of section 210(d) of the Immigration and Naturalization Act ("INA"), as amended by the Immigration Reform and Control Act of 1986 ("IRCA"), relating to a group of aliens known under the Act as special agricultural workers ("SAWs"). The underlying legal dispute between the parties concerns whether the Immigration & Naturalization Service ("INS") may exclude aliens apprehended after November 6, 1986 and before June 1, 1987, who can present non-frivolous claims to eligibility for legalization as SAWs under section 210(a), when such aliens' last attempted entry into the

---

1. The court originally issued its opinion and order in this case on May 4, 1987. Since that time, the Ninth Circuit has withdrawn its opinion reviewing this court's issuance of a temporary restraining order in the case at bar. Accordingly, the court's opinion which to some degree discussed and distinguished the Ninth Circuit's opinion is hereby withdrawn, and the following opinion is substituted in its place.

2. In addition to its motion for injunctive relief, plaintiffs seek to amend the complaint and the class definition, and to add additional parties. At the hearing on these motions, the government indicated that except as to the redefinition of the class it had no opposition to them. The court finds that the proposed amendments should be granted under the liberal standards of Fed.R.Civ.P. 15(a) governing amendments to pleadings, and the requirements of Fed.R.Civ.P.

20(a) governing permissive joinder of parties. Accordingly, the motions are GRANTED nunc pro tunc to March 19, 1987. Plaintiffs' motion to amend the class definition is also GRANTED. The government's argument that the interests of some class members are antagonistic to the interests of other class members appears to be highly speculative and without merit.

3. At the time of the hearing, plaintiffs sought relief on the sixth, seventh, and eighth claims of the second amended complaint. The parties have entered into a settlement agreement as to the seventh and eighth claims dealing with various claims relating to the granting of employment authorization under IRCA, which has been approved by this court, thus leaving only the cause of action relating to the exclusion of SAWs to be resolved herein.

United States occurred after November 6, 1986.

## I

### STANDARDS FOR PRELIMINARY INJUNCTIVE RELIEF

In the Ninth Circuit, two interrelated tests exist for determining the propriety of the issuance of a preliminary injunction. Under the first test, the court may not issue a preliminary injunction unless each of the following requirements are satisfied: (1) the moving party has demonstrated a likelihood of success on the merits; (2) the moving party will suffer irreparable injury and has no adequate remedy at law if injunctive relief is not granted; (3) in balancing the equities, the non-moving party will not be harmed more than the moving party is helped by the injunction; and (4) granting the injunction is in the public interest. *Martin v. International Olympic Committee*, 740 F.2d 670, 674–75 (9th Cir. 1984). Under the second "alternative" test, the court may not issue a preliminary injunction unless the moving party demonstrates "*either* a combination of probable success on the merits and the possibility of irreparable injury *or* that serious questions are raised and the balance of hardships tips sharply in his favor." *Id.* Under the "alternative" test, the two standards are not separate and unrelated, "but rather 'are the ends of a continuum; the greater the relative hardship to the moving party, the less probability of success must be shown.'" *Diaz v. INS*, 648 F.Supp. 638, 643 (E.D.Cal.1986) (quoting *National Center for Immigrant Rights, Inc. v. INS*, 743 F.2d 1365, 1369 (9th Cir.1984)). Under the second prong of the alternative test, the moving party must always demonstrate, at a minimum, that there is a "fair chance of success" on the merits, even if the balance of hardships tips sharply in its favor. *Diaz*, 648 F.Supp. at 643 (citing *Martin*, 740 F.2d at 675).

## II

### THE STANDARDS OF STATUTORY CONSTRUCTION

Plaintiffs seek an order restraining the INS from excluding any alien apprehended by INS who presents a nonfrivolous claim for legalization under section 210 of the Immigration and Naturalization Act, as amended by IRCA.[4] At issue is the INS' interpretation of section 210(d)(1)(A). That section provides:

> BEFORE THE APPLICATION PERIOD—The Attorney General shall provide that in the case of an alien who is apprehended before the beginning of the application period described in subsection (a)(1) and who can establish a nonfrivolous case of eligibility to have his status adjusted under subsection (a) (but for the fact that he may not apply for such adjustment until the beginning of such period), until the alien has had the opportunity during the first 30 days of the application period to complete the filing of an application for adjustment, the alien—
>
> (A) may not be excluded or deported,
>
> . . .

Immigration Reform and Control Act of 1986, Pub.L. No. 99–603, § 302(a), 55 U.S. L.W. 275, 294 (1986).

The INS has interpreted this section to apply only to aliens whose last entry into the United States was before November 6, 1986, including "such alien who has departed and returned to the United States since November 6, 1986 under a grant of advance parole from the INS." INS Legalization Wire No. 12, January 20, 1987; *see also* INS Implementation Wire No. 1, November 14, 1986, at 5.[5] Plaintiffs challenge this construction as contrary to the plain language of the statute, and contend that the stay of exclusion provision of section 210(d)(1)(A) applies to all aliens ap-

---

**4.** The subclass represented by plaintiffs on this claim consists of all persons who possess nonfrivolous claims to legalization as SAWs under INA § 210 and have been or may in the future be excluded from the United States prior to the filing of a legalization application. In addition, several organizations are suing on behalf of themselves and their members.

**5.** November 6, 1986 is not a purely arbitrary date, it is the day the statute became effective.

prehended prior to June 1, 1987 [6] who can establish a nonfrivolous claim for adjustment of status as a SAW, regardless of the date of attempted reentry into the United States.[7]

It is important at the outset to understand what is at stake when an administrative agency's interpretation of a statute is challenged. At issue in such cases is a question of statutory construction; that is to say, the intent of Congress is determinative and not the agency's construction of the language.[8] Thus, when as in the instant case, a court is confronted with a challenge to an administrative agency's construction of a statute it is charged with administering, two questions are presented. First, the court must decide whether Congress has " 'spoken to the precise question at issue, [for] [i]f the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.' " *INS v. Cardoza-Fonseca,* —— U.S. ——, —— n. 29, 107 S.Ct. 1207, 1220 n. 29, 94 L.Ed.2d 434 (1987) (quoting *Chevron U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984)). Put another way, if Congressional intent is clear from the plain words of the statute, the application of other means of construction (e.g., examination of legislative history or deference to an agency's interpretation) is ordinarily unnecessary and thus unwarranted. *See e.g., Church of Scientology of California v. U.S. Dept. of Justice,* 612 F.2d 417, 421 (9th Cir.1979) ("[I]f the language of a statute is clear and there is no ambiguity, then there is no need to 'interpret' the language by resorting to the legislative history or other extrinsic aids.").[9] If Congressional

intent cannot be clearly ascertained, the second question for the court " 'is whether the agency's answer is based on a permissible construction of the statute.' " *INS v. Cardoza-Fonseca,* —— U.S. ——–—— n. 29, 107 S.Ct. at 1220 n. 29 (1987) (quoting *Chevron,* 467 U.S. at 842–45, 104 S.Ct. at 2781–83).

It appears to this court that the Supreme Court has begun to refine the process of ascertaining Congressional intent and to evolve a kind of hierarchy of canons of statutory construction. As I explain below, under this evolving doctrine, analysis commences with application of the plain meaning rule, followed by examination of the legislative history. If an ambiguity remains after application of these two primary means of construction, then a court may resort to other textual means of construction, ending with resort to extrinsic aids. In no event, however, may canons of construction extrinsic to the text be employed to create an ambiguity which is not inherent in the language employed by Congress, or at least resulting from examination of the legislative history. *See e.g., Albernaz v. United States,* 450 U.S. 333, 343, 101 S.Ct. 1137, 1144, 67 L.Ed.2d 275 (1981) (principle of lenity serves only as an aid for resolving ambiguity; it is not used to beget one). This principle is of real significance in cases where an agency's construction of a statute is being challenged because, as I explain below, deference to the agency's construction is a form of extrinsic statutory construction and is thus significant only if ambiguity exists as a result of textual examination.

To recapitulate, where an agency's statutory construction is challenged, the court is to employ a two-step process: first, ascertain whether Congress has spoken to

---

**6.** This is the starting date of the application period for adjustment of status under § 210(a). *See* § 210(a)(1)(A).

**7.** The issue before the court pertains only to the stay of exclusion provision of § 210(d)(1)(A), not to the stay of deportation provided for in the same section.

**8.** As I explain *infra,* in appropriate circumstances examining the agency's interpretation may aid the court in construing the statute, but the

issue is Congressional intent, not the agency's interpretation of that intent.

**9.** Of course, the plain meaning rule does not prohibit resort to legislative history, *Watt v. Alaska,* 451 U.S. 259, 266, 101 S.Ct. 1673, 1677, 68 L.Ed.2d 80 (1981), rather where the language is plain, there is no need to look beyond the statute. *Heppner v. Alyeska Pipeline Service Co.,* 665 F.2d 868, 870–71 (9th Cir.1981).

the issue; if the answer to the first question is uncertain, then determine if the agency's construction is permissible under the statute. To answer the first question, the court employs traditional tools of statutory construction, looking first to the statutory language and then, if necessary, to the legislative history. *Cardoza-Fonseca*, —— U.S. at ——, 107 S.Ct. at 1221; *see also Brock v. Writers Guild of America, West, Inc.*, 762 F.2d 1349, 1353 (9th Cir.1985) ("In construing a statute in a case of first impression, [courts] look to the traditional signposts of statutory construction ..."). Thus, the first step in statutory construction is application of the plain meaning rule.[10] If the statutory language is clear and unambiguous, " 'that language must ordinarily be regarded as conclusive,' [citation omitted]". *North Dakota v. United States*, 460 U.S. 300, 312, 103 S.Ct. 1095, 1102, 75 L.Ed.2d 77 (1983). In such circumstances, a court may look at the legislative history "to determine only whether there is 'clearly expressed legislative intention' contrary to that language, which would require us to question the strong presumption that Congress expresses its intent through the language it chooses [citation omitted]." *Cardoza-Fonseca*, —— U.S. —— at —— n. 12, 107 S.Ct. at 1213 n. 12 (citations omitted).

It is, of course, true that the interpretation of a statute by the agency charged with its administration is also one of the traditional tools employed to determine Congressional intent. *Brock*, 762 F.2d at 1353. It seems clear, however, that this canon is secondary to application of the plain meaning rule, examination of the legislative history, and other tools of critical textual examination. As the Supreme Court recently explained, " '[t]he judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear Congressional intent.' " *Cardoza-Fonseca*, —— U.S. —— at ——, 107 S.Ct. at 1219 (quoting *Chevron*, 467 U.S. at 843 n. 9, 104 S.Ct. at 2781 n. 9). As I explained above, Congressional intent is ordinarily embodied in the text of the statute, *see also Fuller*, 615 F.Supp. at 1057, *rev'd on other grounds*, 786 F.2d 1437 (9th Cir.1986). Thus, administrative interpretation, an extrinsic aid to construction, is only relevant where examination of the text and the legislative history leaves an unresolved ambiguity.[11] Accordingly, in the instant case, the court must first examine the text of the statute and, if necessary, the legislative history to determine whether Congressional intent is clear. If it is, the court must then determine whether the agency interpretation is inconsistent with that clear intent. It is principally where Congressional intent is not clear from the statutory text and the legislative history that a reviewing court gives substantial deference to "reasonable" agency constructions. *See Cardoza-Fonseca*, —— U.S. at —— —— —— n. 29, 107 S.Ct. at 1220 n. 29 (citing *Chevron*, 467 U.S. at 842–45, 104 S.Ct. at 2781–83).[12] Given these exacting standards, I now turn to resolution of the dispute.

### III

### CONSTRUCTION OF SECTION 210

To put the matter bluntly, the plain language of section 210(d) supports plaintiffs'

---

**10.** I have recently bemoaned the erratic phrasing and application of the "plain meaning" rule, *see Sierra Club v. Watt*, 608 F.Supp. 305, 332 n. 49 (E.D.Cal.1985), and expressed a suspicion that application of the rule varies from case to case. *See Fuller v. United States*, 615 F.Supp. 1054, 1057 n. 5 (E.D.Cal.1985), *rev'd on other grounds*, 786 F.2d 1437 (9th Cir.1986). Even if the stringency of application of the rule for some reason varies with the subject matter, strict application of the plain meaning rule in construing immigration statutes has recently been endorsed by the Supreme Court in *Cardoza-Fonseca*.

**11.** Indeed, the Ninth Circuit has suggested an even more restrictive application of the deference standard, relying on *Cardoza-Fonseca* for the proposition "that *Chevron*'s rule of deference to agency interpretation is applicable only in situations where 'the agency is required to apply [legal] standards to a particular set of facts.' " *Adams House Health Care v. Heckler*, 817 F.2d 587, 593 (1987).

**12.** As I explain in footnote 16, *infra*, a second circumstance where deference may be required is where Congress left to the agency resolution of conflicting policy matters. As I explain there, however, that circumstance does not apply to the matter at bar.

position and is inconsistent with defendant's construction. The statute requires that "the Attorney General shall provide that ... alien[s] ... apprehended before [June 1, 1987] who can establish a nonfrivolous claim [to being a SAW] may not be excluded or deported...." The statute seems perfectly clear and it is difficult to see what occasion for interpretation exists, much less what permits the construction placed upon it by the INS.

■ Nonetheless, because all language has some malleability, I will examine the terms employed by Congress to determine whether use of those terms justifies departure from the apparent meaning of the statute. I begin by observing that the words used in a statute are to be given their ordinary meaning unless it may be ascertained that the term has a specialized one. *Perrin v. United States*, 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979); *Moorhead v. United States*, 774 F.2d 936, 941 (9th Cir.1985). I also note that the only two words in the section which could bear upon the question are "exclude" and "apprehend."

■ I begin with the word "exclude." The common meaning of the term is "to shut out, restrain or hinder the entrance of." Webster's Third New International Dictionary 793 (1976). The word "exclude" may, however, be viewed as a term of art in immigration law. In that context, it means to deny "admission" or "entry" into the United States. *See* 8 U.S.C. §§ 1182, 1226; *see also Landon v. Plasencia*, 459 U.S. 21, 25–28, 103 S.Ct. 321, 325–27, 74 L.Ed.2d 21 (1982). Applying either meaning, however, section 210(d) manifests a Congressional determination that SAW-eligible aliens apprehended before the beginning of the application period shall not be denied "admission" or "entry" into the United States.

■ The word "apprehend" is equally unambiguous. It seems clear that Congress used the term in section 210 to mean "to take possession of, to take hold of, to take (a person) in legal process, arrest, seize." Websters at 106. Like "exclude," however, the word "apprehend" may also

have a specialized meaning in the immigration context. In his deposition, INS Assistant Commissioner Brien testified that his understanding of the term "apprehended" in the immigration context was "encountering an alien, determining his deportability, and then taking certain actions, if it is determined that he is unlawfully in the United States." *Id.* at 43. The legislative history discusses "apprehensions" by the Border Patrol and includes a projection of the number of aliens that the INS will "apprehend" this year; the majority expected to be apprehended are "those seeking entry along the Southwest border." H.R.Rep. No. 682(I), 99th Cong., 2d Sess., *reprinted in* 1986 U.S. Code Cong. & Ad. News 5649, 5651. I conclude that Congress used the word "apprehend" in the same sense it is used in compiling the statistics referred to in the legislative history, but that the immigration meaning is, in essence, the same as the dictionary sense.

■ Given the examination above, it seems clear that neither of the terms used by Congress, "exclude" or "apprehend," create ambiguity justifying departure from the statute's plain words. Indeed, the true disagreement between the parties is not over the meaning of any of the precise terms of section 210(d)(1)(A). Rather, the dispute centers on the category of aliens to whom this stay of exclusion applies; but examination of the text provides no grounds for dispute. The application period begins on June 1, 1987. *See* § 210(a)(1)(A). Thus, by its terms, the statute refers to aliens apprehended before that date. The only conditions which an alien must meet under the plain language of the statute is that s/he must be apprehended by the INS and s/he must be able to present a nonfrivolous claim to eligibility for adjustment of status as a SAW. There is no requirement in the language of section 210(d) or in any other subsection of section 210 that the alien have been present in the United States on November 6, 1986, to qualify for this stay of exclusion. The plain language of the statute demonstrates that Congress intended the section to apply to all aliens with nonfrivolous claims ap-

prehended during the preapplication period, regardless of their date of re-entry into the United States.

Moreover, employing other standard textual tools reinforces the conclusion reached above. It is fundamental that the language of the subsection at issue must be read in the context of the statute as a whole. *Flint v. State of California*, 594 F.Supp. 443, 447 (E.D.Cal.1984) (citing *Stafford v. Briggs*, 444 U.S. 527, 535, 100 S.Ct. 774, 780, 63 L.Ed.2d 1 (1980); *Green v. Commissioner*, 707 F.2d 404, 405 (9th Cir.1983)). As I now explain, application of this rule also supports plaintiffs' position.

The other legalization provision, section 245A, requires aliens applying for legalization under that section to demonstrate, among other things, continuous physical presence in the United States since November 6, 1986. *See* § 245A(a)(3)(A). Section 245A(a)(3)(C) further provides that "[n]othing in this section shall be construed as authorizing an alien to apply for admission to, or to be admitted to, the United States in order to apply for adjustment of status under this subsection." By contrast, section 210 contains neither the preceding language nor the requirement of continuous physical presence. Indeed, to the contrary, the Joint Explanatory Statement of the Committee of Conference expressly states that "[i]t is the intent of the Conferees that the residence requirement for [SAWs] does not require that a prospective [SAW] had to have been continuously present in the United States in order to qualify for such status...." H.R.Conf.Rep. No. 1000, 99th Cong., 2d Sess., *reprinted in* 1986 U.S. Code Cong. & Ad.News 5840, 5851. "'Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'" *Cardoza-Fonseca*, —— U.S. —— at ——, 107 S.Ct. at 1213 (quoting *Russello v. United States*, 464 U.S. 16, 23, 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983)).

The government argues, however, that if all of the provisions of the statute are read together, the inexorable conclusion that must follow is that Congress only intended to halt exclusion proceedings that were underway as of November 6, 1986. The government presents essentially two arguments in support of this position. The first is based on the provision of section 210(b), which provide for adjustment of status for SAWs both inside and outside the United States. In essence, the government contends that to permit aliens who entered the United States after November 6, 1986 to apply for SAW status here would be to nullify section 210(b)(1)(B), which provides for adjustment of status applications to be filed outside of the United States.

Section 210(b)(1) provides that applications for adjustment of status may be made either inside or outside the United States. Specifically, the statute provides:

(A) WITHIN THE UNITED STATES— The Attorney General shall provide that applications for adjustment of status under subsection (a) may be filed—

(i) with the Attorney General, or

(ii) with a designated entity ...

(B) OUTSIDE THE UNITED STATES— The Attorney General, in cooperation with the Secretary of State, shall provide a procedure whereby an alien may apply for adjustment of status under subsection (a)(1) at an appropriate consular office outside the United States. If the alien otherwise qualifies for such adjustment the Attorney General shall provide such documentation of authorization to enter the United States and to have the alien's status adjusted upon entry as may be necessary to carry out the provisions of this section.

IRCA § 302(a), 55 U.S.L.W. 274, 293.

While it is certainly true that the section permits non-resident aliens to apply to consulates, there is nothing in this section which requires aliens to apply either inside or outside the United States, depending upon where they were the day the statute was enacted. Indeed, the legislative history, though sparse on the subject, suggests that the alternatives were provided to facilitate the wishes of the aliens seeking adjustment. *See* H.R.Rep. No. 682(I) at 86,

1986 U.S.Code Cong. & Ad.News at 5690 ("[I]ndividuals wishing to apply may do so either inside or outside the United States. For those wishing to apply from abroad, the Attorney General, in cooperation with the Secretary of State, is instructed to provide a procedure whereby such aliens may apply for adjustment of status at an appropriate consular office outside the United States.").[13] I cannot conclude from the application process delineated in section 210(b) that Congress intended to impose a continuous physical presence requirement in section 210, nor can I conclude that staying the exclusion of certain apprehended aliens during the preapplication period would nullify the provisions of section 210(b).

The government also argues that plaintiffs' interpretation of the statute leads to an absurd result. Since Congress did not allow aliens to simply present themselves at the border and claim admission as SAWs, the government argues that it is "absurd to believe that Congress wanted an *illegal* entry to be the sole way for this type of alien to come *lawfully* into the United States." Defendant's Memorandum in Opposition at 42. The government bolsters this argument by pointing out that the purpose of IRCA was to "regain control of the borders" of this country, and that an interpretation of section 210(d) which would encourage or reward an attempted illegal entry into the country is at odds with that statutory aim. The government's absurdity argument is, to say the least, not without persuasive force. Nonetheless, as I explain below, the argument

does not justify denial of a preliminary injunction.

It has been recognized that there are times where application of the plain language of a statute may produce an "absurd" or "unexpected" result. *See Crooks v. Harrelson*, 282 U.S. 55, 60, 51 S.Ct. 49, 50, 75 L.Ed. 156 (1930) ("Laws enacted with good intention, when put to the test, frequently, and to the surprise of the law maker himself, turn out to be mischievous, absurd or otherwise objectionable."); *Heppner v. Alyeska Pipeline Service Co.*, 665 F.2d 868, 872 (9th Cir.1981). The Supreme Court has sometimes held that absurd results warrant looking beyond the plain language of the statute to the legislative history; at other times the court has held that "absurd or curious results do not require examination of the legislative history." *Heppner*, 665 F.2d at 872 (comparing *United States v. American Trucking Ass'n*, 310 U.S. 534, 543, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345 (1940) and *Church of Holy Trinity v. United States*, 143 U.S. 457, 459, 12 S.Ct. 511, 512, 36 L.Ed. 226 (1892) with *TVA v. Hill*, 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978)).

In *Heppner*, the Ninth Circuit proferred guidelines for distinguishing between the two types of cases:

The first type [of absurd result] occurs when a congressional decision produces an unexpected absurd result. It arises out of a failure to trace through the effects of the legislation in cases in which the statute was intended by Congress to apply.... Such mistakes, because they are substantive matters of policy, are for the Congress, not the

---

**13.** It is important to note that during the application period, aliens who present nonfrivolous applications for adjustment of status under § 210 may not be excluded or deported either. *See* § 210(d)(2)(A). In this context, the omission of the language of § 245A(a)(3)(C), read in conjunction with the provisions of § 210(b), makes sense. The statutory scheme provides for an alien to make an application for adjustment of status abroad and then to obtain documentation for entry into the United States and for adjustment of status upon entry. Such an alien may not be "excluded" and must be admitted into the United States and have his/her status adjusted upon entry, i.e., upon admission.

The word "exclude" used in this context again must refer to denial of "admission" or "entry." Another textual rule of statutory construction is that words carry the same meaning throughout a statute, unless Congress specifically intends the word to carry a different meaning in a particular context. *See Mills Music, Inc. v. Snyder*, 469 U.S. 153, 164–65 and n. 31, 105 S.Ct. 638, 646 n. 31, 83 L.Ed.2d 556 (1985); *Bureau of Alcohol, Tobacco & Firearms v. Federal Labor Relations Authority*, 672 F.2d 732, 736 (9th Cir. 1982), *rev'd on other grounds*, 464 U.S. 89, 104 S.Ct. 439, 78 L.Ed.2d 195 (1983); *Chugach Natives, Inc. v. Doyon, Ltd.*, 588 F.2d 723, 725 (9th Cir.1978).

courts, to correct. In this sense, and short of constitutional error, Congress has a right to be wrong.

The second type of absurdity results from a drafting error. It occurs, for example, when Congress uses more sweeping language than it would if it were attending carefully to fact situations, outside the scope of its purpose, to which the language might be erroneously understood to apply. This second type of mistake is one that a court may correct by interpretation—if the court is in a position to infer the actual intent of Congress.

*Heppner,* 665 F.2d at 872.

In the present case, the result the government suggests is absurd (excluding only those who attempt to enter without inspection, rather than those who approach the border in an orderly manner) is caused not by the inclusion of *more* sweeping language, but the inclusion of narrower, limiting language. Thus, the purported absurdity arises because Congress limited the stay of exclusion to aliens *apprehended* by INS, rather than extending it to those presenting at ports of entry. It thus appears that the "absurd" result the government warns of is of the first "Heppner" type, rather than the second. The "mistake" is directly related to what category of aliens will not be excluded and under what circumstances, a matter within the purview of Congressional authority, and a matter of substantive policy. Under this analysis, the untoward result is not the type of "error" that this court is free to correct.

Even if the analysis undertaken above did not end the matter, defendant's position would not be any stronger. As I shall now explain, at best, finding that the error was of the second *Heppner* type would only permit resort to the legislative history so as to discover Congress' true intent concerning the purported absurdity. Examination of that history, however, does not support the government's restriction of section 210 to only those subject to exclusion proceedings on November 6, 1986.

On occasion, a party may introduce an ambiguity into otherwise unambiguous statutory language by pointing to something within the legislative history "so probative of the intent of Congress as to require a reevaluation of the meaning of the statutory language." *Heppner,* 665 F.2d at 871. *See also Edwards v. Bowen,* 785 F.2d 1440 (9th Cir.1986) (government's arguments over the meaning of particular statutory phrases "inject[ed] ambiguity into otherwise unambiguous language," requiring resort to legislative history). Nonetheless, such a venture into the legislative history must be approached cautiously, mindful of the general rule that " '[v]ery strong' evidence or explicit language from the legislative history is necessary to overcome the plain meaning naturally to be drawn from the language of the statute." *In re Seidel,* 752 F.2d 1382, 1385 (9th Cir.1985).

In the matter at bar, no explicit evidence or strong language to support the government's position can be drawn from the legislative history. Indeed, what legislative history there is may be generally read to support plaintiffs' position. The most extended discussion of section 210(d) is found in the Joint Explanatory Statement of the Committee of the Conference and deals with the limitations the Committee has placed on the inquiries the INS may make for the purpose of establishing a nonfrivolous claim to SAW status. H.R.Conf.Rep. No. 1000 at 96–97, 1986 U.S.Code Cong. & Ad.News at 5852. This history neither supports or undermines the plaintiffs' position. At least two Congressmen, however, recognized the possibility that the statute created a presumption in favor of aliens "simply crossing the border claiming that they are agricultural workers and have worked for the necessary time period." Additional Views of Hon. Dan Lungren, H.R.Rep. No. 682(I) at 213, 1986 U.S.Code Cong. & Ad.News at 5749; *see also* 132 Cong.Rec. H9731 (daily ed. Oct. 9, 1986) (statement of Cong.Combest). While these references are hardly conclusive, they are some evidence that the situation now at issue was presented to the Congress, and Congress enacted the statute without modi-

fication anyway. *Cf. U.S. v. Turkette,* 452 U.S. 576, 587, 101 S.Ct. 2524, 2530, 69 L.Ed.2d 246 (1981) (interpretation of RICO encompassing both legitimate and illegitimate enterprises not rejected on the basis that the interpretation would "substantially alter the balance between federal and state enforcement of criminal law" where Congress was "well aware" of these objections to the statute and nonetheless enacted the measure "in the face of" such objections).

In sum, the plain language of the statute and the legislative history clearly suggests to this court that plaintiffs have presented serious questions for litigation. Indeed, but for the apparent untoward result, this court would assess plaintiffs' chances of prevailing as overwhelming.

## IV

### EQUITABLE CONSIDERATIONS

#### A. *Balance of Hardships/Irreparable Harm*

■ The plaintiffs advance three principal harms threatening the class members by virtue of the INS' present policy. First, plaintiffs argue that SAWs who are presently outside the United States will miss the 1987 harvest. Plaintiffs presented evidence which suggests that approximately 1,800–3,600 members of the United Farm Workers Union who are eligible for adjustment of status are currently outside the United States. *See* Deposition of Karl Lawson at 7, 14, 18. Mr. Lawson also testified in his deposition that the peak harvest months are May, June and July. *Id.* at 21. Since the application period for SAWs doesn't even begin until June 1, 1987, it appears almost certain that SAW-eligible aliens outside the United States who are not permitted to return until sometime after they file their applications will miss the peak harvest months for 1987.

Secondly, plaintiffs argue that SAW-eligible aliens outside the United States will have tremendous difficulty obtaining the documentation necessary to support their applications from abroad. Third, plaintiffs argue that such aliens will be virtually deprived of the assistance and advocacy of community groups located in the United States, despite the fact that Congress intended applicants to receive such aid. *See* H.R.Rep. No. 1000 at 93, 1986 U.S.Code Cong. & Ad.News at 5848.

Plaintiffs' arguments are persuasive. The Ninth Circuit has previously held that the hardship to an alien from being unable to work to support oneself and one's dependents, "and to pay for legal representation is beyond question." *National Center for Immigrants Rights v. I.N.S.,* 743 F.2d at 1369.[14] For these SAW-eligible aliens, exclusion from this country for the 1987 harvest will, as a practical matter, preclude the aliens from working and substantially interfere with their obtaining the documentation necessary to support a legalization application. Further, the injury that will result if a SAW-eligible alien cannot obtain the requisite documentation and the aid of community groups may well be irreparable, for such an alien will lose the one time opportunity to apply for adjustment of status under IRCA, a benefit Congress intended to extend to eligible aliens.

The principal harm to the agency that will result from issuance of a preliminary injunction is the administrative burden placed on the agency if they are required to determine whether an alien is eligible for legalization as a SAW in an exclusion hearing. The agency contends that it will be required to conduct a 30-minute interview with each alien who presents such a claim. *See* Declaration of Richard Norton at 10. It appears, however, that the estimates of harm in this regard were based upon a belief that the plaintiffs were seeking this relief for every alien who presented to a port of entry. In fact, the requested relief would only extend to aliens apprehended by the INS and placed in exclusion proceed-

---

14. I have previously explained that although severe monetary damage is ordinarily insufficient to support injunctive relief, where no action for compensation will lie the loss is "irreparable in every ordinary meaning of the term." *Greene v.* *Bowen,* 639 F.Supp. 554, 563 (E.D.Cal.1986). Clearly, SAWs who were excluded during the 1987 harvest would have no action for compensation against anyone, even if such exclusion were ultimately found to be improper.

ings. Consequently, the relief sought would only require the INS to obtain additional information from aliens already in proceedings. Accordingly, the court finds that the administrative burden placed upon the INS is de minimus and thus, the balance of harm tips sharply in favor of plaintiffs.

B. *Public Interest*

The government also argues that granting the preliminary injunction will result in harm to the public interest. It contends that the requested injunction will cause the agency to "lose control of the borders," in contravention of the very purpose of IRCA. In essence, the INS claims that aliens trying to enter the country illegally will give false answers when questioned in order to establish a nonfrivolous case for SAW status and will then disappear into the interior of the United States. *See* Declaration of Richard Norton at 11. The issue tendered by the government is very serious. Nonetheless, as I now explain, it appears that the threat of fraudulent applications was determined by Congress to be worth the risk in light of the benefits that Congress perceived were to be gained by the SAW program.

The legislative history makes it clear that the Congress mandated a limited inquiry in order to demonstrate a nonfrivolous claim to SAW status.[15] It seems plain that the Congress intended the INS to go no further than obtaining a simple affidavit from SAWs protected by section 210. What this portion of the legislative history makes clear is that Congress intended the procedure for establishing a nonfrivolous

claim to be relatively straightforward and streamlined. That is, Congress sought to control the problem of fraud not through an elaborate factfinding procedure, but rather through the imposition of penalties for false statements.

The Congressional purpose in requiring only the affidavit was two-fold; first, as the Joint Statement explains (see footnote 15, *supra*), it was to encourage eligible aliens to "come forward" and legalize their status. It is apparent, however, that a second reason was to insure a plentiful supply of agricultural workers. In this regard, Congress noted several concerns expressed by Deputy Secretary of Agriculture John R. Norton. These included the dependence of the national economy and the American consumer on a "stable and adequate supply of agricultural labor to maintain commodity supplies at reasonable price levels," and the integral relationship between agricultural labor and international sales, the United States' balance of payments, and American jobs in the industries that support agriculture such as "packing, hauling, refrigeration, marketing, and other related industries." H.R.Rep. No. 682(I) at 83, 1986 U.S.Code Cong. & Ad.News at 5687. In sum, both granting and denying the preliminary injunction will adversely affect some aspect of the public interest as defined by Congress. On the one hand, improperly excluding agricultural workers from this country may harm that aspect of the public interest protected by the SAW program; on the other hand, not excluding those guilty of attempted illegal entry will harm other interests to be served by IRCA. Congress' resolution of these competing

---

**15.** The Joint Explanatory Statement of the Committee of the Conference explains: "Under subsection (d) of new section 210 of the House amendment the managers provide for a temporary stay of deportation or exclusion for certain applicants who can establish a nonfrivolous case of eligibility for adjustment of status under subsection (a). The Conferees intend that the Immigration and Naturalization Service allow aliens to make a declaration, under penalty of perjury and under such terms and conditions that the Attorney General may by regulation provide, (i) attesting that they have in fact worked the requisite number of man-days required; (ii) identifying the type or nature of documentation they intend to adduce to make

the necessary showing (although this shall not limit their rights to produce other evidence at a later date); (iii) acknowledging that false statements concerning their eligibility constitute a violation of Title 18 U.S.C., and may make them ineligible for this program, and further, subject to deportation or exclusion; and (iv) identifying their current or immediate past employer(s). The Conferees intend that INS not go beyond these criteria in seeking to determine whether an alien has made a nonfrivolous case for eligibility. To do otherwise may undermine the purposes of this section, viz., to encourage undocumented workers to come forward and obtain legal status." H.R.Rep. No. 1000 at 96–97, 1986 U.S.Code Cong. & Ad.News at 5852.

concerns must be respected not only by the INS, but by this court. Since Congress chose not to permit an elaborate factfinding process to precede non-exclusion of SAWs, I conclude that it chose the presence of SAWs as the more pressing public interest to be served.[16]

## V

### CONCLUSION

This is a preliminary injunction. Applying the standards that prevail in this circuit, the court finds that plaintiffs have raised serious questions and that the balance of hardships as between these parties tips decidedly in favor of plaintiffs. The court further finds that while there may be competing public interests, it appears Congress has resolved such tension as exists among those interests. As far as this court can tell, there may be harm to the public interest whether or not the injunction issues, and conversely, certain aspects of the public interest embodied in IRCA will be protected whether or not this injunction issues. Accordingly, the court must apply the statutory scheme that Congress envisioned, for the court must assume that Congress acted in the public interest when it passed this bill. The plain language of the statute suggests that Congress intended that those aliens apprehended by the INS during the preapplication period and placed in exclusion proceedings who could present a nonfrivolous claim for adjustment of status under section 210 would not be excluded.

Accordingly, defendant Attorney General, and all persons acting by, through, or under him, or subject to his control or supervision, are hereby enjoined from excluding any alien apprehended during the period from November 6, 1986 to June 1, 1987, who can present a nonfrivolous claim for adjustment of status within the meaning of section 210(a) of IRCA, regardless of the date of last attempted entry into the United States.

IT IS SO ORDERED.

---

**16.** It may be argued that IRCA represents the embodiment of several competing policies and thus, deference must be paid to the agency's resolution of those questions. That argument must be rejected. It is true that the high Court has taught that deference is due where " ' "decision as to the meaning or reach of a statute has involved reconciling conflicting policies, and a full understanding of the force of the statutory policy in the given situation has depended upon more than ordinary knowledge respecting the matters subjected to agency regulations" ' ". *Cardoza-Fonseca,* — U.S. — n. 29, 107 S.Ct. at 1220 n. 29 (quoting *Chevron,* 467 U.S. at 842–45, 104 S.Ct. at 2781–83, in turn quoting *United States v. Shimer,* 367 U.S. 374, 382–83, 81 S.Ct. 1554, 1560–61, 6 L.Ed.2d 908 (1961)). In such situations, courts should not disturb the agency interpretation if it "represents a reasonable accommodation of conflicting policies that were

committed to the agency's care by the statute, ... unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned." *Id.* This principle is inapplicable to the present situation for several reasons; first is the fact that the policies embodied in IRCA do not conflict; the overarching policy of the statute is to insure that all individuals present in the United States are documented and entitled to be here by law. The SAW provisions do not conflict with that purpose but provide a restricted means of accomplishment relative to a subclass whose presence in this country is regarded as vital. Second is the fact that Congress itself undertook to accommodate the apparently competing policies involved in the SAWS issue. Both of these observations appear to be the inevitable result of application of the plain meaning rule.