**SACRAMENTO REGIONAL COUNTY SANITATION DISTRICT, Plaintiff,**

v.

**Lee M. THOMAS, et al., Defendants.**

**And related counterclaim.**

**No. Civ. S–85–1802 LKK.**

United States District Court, E.D. California.

Sept. 17, 1987.

As Amended Oct. 16, 1987.

---

L.B. Elam, County Counsel, Robert L. Pleines, Supervising Deputy County Counsel, Sacramento County, Sacramento, Cal., Henry L. Diamond, Richard S. Davis, Kenneth S. Kaufman, Beveridge & Diamond, Washington, D.C., for plaintiff.

David F. Levi, U.S. Atty., Joseph F. DePietro, Asst. U.S. Atty., Sacramento, Cal., Carl Strass, Environmental Defense Section, Land & Natural Resources Div., U.S. Dept. of Justice, Washington, D.C. (Anthony F. Guadagno, Atty. Advisor, Office of Gen. Counsel, U.S. Environmental Protection Agency, Washington, D.C., of Counsel), for defendants.

## ORDER

KARLTON, Chief Judge.

This action came before the court on cross motions for summary judgment. After hearing the motions were taken under submission. This order disposes of the motions and the case.

## I

### THE UNCONTESTED FACTS

In 1979, the Environmental Protection Agency ("EPA") awarded the Sacramento Regional County Sanitation District ("District") a grant under Title II of the Clean Water Act, 33 U.S.C. §§ 1281–1299, for the construction of a solids processing and disposal facility at the District's regional wastewater treatment plant. The construction of the facility required the filling of approximately 48 acres of wetlands at the project site. All federal and state agencies involved in the construction, including the EPA, the United States Fish and Wildlife Service, the California Department of Fish and Game, and the California State Water Resources Control Board, determined that the District would have to build artificial wetlands to compensate for the loss of the natural wetlands. Indeed, the EPA grant was conditioned on the construction of the compensating wetlands.

Between January and April of 1980, the District wrote a number of letters to the

California State Water Resources Control Board ("State Board") requesting additional grant funds for the purchase of the mitigation wetlands. The State Board acts as the agent of the EPA for purposes of carrying out the Clean Water Act construction grant program in California. By letter dated April 29, 1980, the State Board authorized the District to purchase land for purposes of constructing the new wetlands. The letter explicitly noted that the land was only "potentially grant-eligible," and that "the authorization does not constitute a commitment to award a grant for reimbursement of the incurred costs." Immediately after receiving authorization from the State Board, the District purchased land upon which the mitigation wetlands were to be constructed.[1] The District applied to the EPA for a grant amendment to cover the cost of buying the land. On November 10, 1980, the EPA transmitted the approved grant amendment to the District.

Soon after approving the grant, the EPA began to have second thoughts about funding the purchase of mitigation wetlands. In a December 5, 1980 meeting between staff of the EPA and the State Board, the EPA expressed doubts that federal law permitted the EPA to provide construction grants for the acquisition of mitigation wetlands. In a follow-up letter to the State Board, dated February 6, 1981, the EPA made its position clear. That letter stated flatly that the EPA "staff had throughly reviewed the matter and it is our conclusion that the federal law governing the construction grants program does not allow as an eligible cost the acquisition of land as a mitigation measure." The letter urged the State Board to inform the District of the EPA's position. Neither the EPA nor the State Board notified the District that questions had been raised concerning the eligibility of mitigation wetlands for funding.[2]

During the summer of 1981, the District was still waiting for the check from the EPA which was to be issued pursuant to the approved grant amendment. On August 6, 1981, the State Board informed the District by letter that the District would shortly be receiving the approved funds. The District eventually received a check from the United States Treasury in the amount of $812,000, of which $438,202 represented the 75 percent federal share of the actual cost of acquiring the mitigation wetlands.

A year later, during the summer of 1982, state auditors under contract with the EPA conducted a final audit of the construction project. During the exit conference on August 4, 1982, the auditors questioned whether the land the District had acquired to build the new wetlands was eligible for a construction grant. This was the first time the District learned that the there was a question as to the grant-eligibility of mitigation wetlands. In its final report, the auditors concluded that the cost incurred by the District in acquiring the mitigation wetlands was not an allowable project cost, and disallowed it. The District strenuously objected to the disallowance, and initiated administrative proceedings.

## II

## THE EPA ADMINISTRATIVE DECISION

On July 6, 1984, the Regional Disputes Decision Official of EPA Region 9 issued a decision which confirmed the disallowance. The District requested that the EPA Regional Administrator review the decision of the Regional Disputes Decision Official. On June 6, 1985, the Regional Administrator affirmed the decision of the Regional Disputes Decision Official.

The Regional Administrator concluded that the grant funding for the District's purchase of mitigation wetlands should be disallowed. The first basis for the decision was that, according to the Regional Administrator, the Clean Water Act does not permit construction grant funding to be used for the

---

1. Although unclear, it appears that the District purchased some of the land prior to receiving authorization from the State Board. Evidently, the District bought a total of 110 acres of land for use as compensating wetlands.

2. The District did not receive a copy of the February 6, 1981 EPA letter to the State Board until August 14, 1982.

purchase of land unless the land is an integral part of the waste treatment process or is to be used for the ultimate disposal of residues resulting from the treatment process. Since land purchased to replace natural wetlands is neither an integral part of the treatment process nor used for the ultimate disposal of waste residue, the Regional Administrator reasoned, the Clean Water Act does not authorize, and in fact prohibits, EPA funding of the purchase of such land.

Second, the Regional Administrator concluded that the acquisition of replacement wetlands is not permitted by 40 C.F.R. § 35.940–1(h), which expressly permits funding for the "[c]osts of complying with the National Environmental Policy Act ("NEPA"), including costs of public notices and hearings." The Regional Administrator found that the section applies only to the costs of complying with NEPA procedures, and does not authorize the reimbursement of costs which are incurred in the course of taking substantive steps to mitigate adverse environmental effects.

Finally, the Regional Administrator held that the EPA was not estopped from recovering the grant funds simply because the funds had already been dispersed. The Regional Administrator premised this conclusion on her belief that the Clean Water Act does not authorize the EPA to fund the acquisition of compensating wetlands. She determined that even if the District relied on the initial grant of funds, the federal government is never obligated to honor unauthorized financial commitments. In addition, the Administrator noted that by regulation the EPA has the right to recover all unallowable costs at the time of final audit. *See* 40 C.F.R. §§ 30.615, 30.815, 30.-820.

The District sought discretionary review by the EPA Assistant Administrator for Water. The request was denied.

### III

### THE LAWSUIT

The District filed this action for declaratory and injunctive relief against the EPA and Lee Thomas, the EPA Administrator. The first cause of action, brought under the Administrative Procedure Act ("APA"), 5 U.S.C. § 702, alleges that the EPA's final decision is arbitrary, capricious, and erroneous as a matter of law. The second cause of action alleges that any EPA action would constitute an unlawful attempt "to modify the binding contractual obligation of the United States" created under the Clean Water Act, 33 U.S.C. § 1283(a). The final cause of action alleges that the EPA is estopped from attempting to recoup the money.

### IV

### THE MOTIONS FOR SUMMARY JUDGMENT

The District moves for summary judgment on the first and second counts of the complaint. The EPA moves for summary judgment on all counts. Since the District by this action seeks review of a final agency decision under the APA, I will begin by summarizing the standards that I must apply in reviewing that decision.

### A. *Standard of Review*

When a motion for summary judgment is before the court, the court is ordinarily guided by the standards articulated in Federal Rule of Civil Procedure 56(c), which provides that summary judgment is appropriate when there exists "no genuine issue of material fact and the moving party should prevail as a matter of law." *Jung v. FMC Corp.*, 755 F.2d 708, 710 (9th Cir. 1985). When the court is called upon to review an agency decision, however, the standards for summary judgment are modified by 5 U.S.C. § 706(2), at least with respect to factual disputes. The question is not whether there is a genuine issue of material fact, but "rather whether the agency action was arbitrary, capricious, an abuse of discretion, not in accordance with law, or unsupported by substantial evidence on the record taken as a whole." *Good Samaritan Hospital, Corvallis v. Mathews*, 609 F.2d 949, 951 (9th Cir.1979). This standard is derived from the APA, 5

U.S.C. § 706(2), which provides in part that the reviewing court shall

> hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law ... [or] (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute.

*Good Samaritan Hospital,* 609 F.2d at 951.

The exact nature of review is dependent upon whether the question is one of fact or one of law. The factual findings of an agency are entitled to substantial deference, although the degree of deference in any given case is by no means clear.[3]

In contrast, because courts are the final authorities on questions of statutory interpretation, *California Energy Resources Conservation and Development Commission v. Johnson,* 807 F.2d 1456, 1461 (9th Cir.1986), legal issues, including questions of statutory construction, are reviewed de novo. *Blackfeet Tribe v. United States Department of Labor,* 808 F.2d 1355, 1357 (9th Cir.1987). In some circumstances, the agency's interpretation of governing statutes and regulations is entitled to deference. I discuss below when it is appropriate to defer to an agency interpretation.

### B. *Principles of Statutory Construction*

▆ This action reviews the EPA's interpretation of three provisions of the Clean Water Act, 33 U.S.C. §§ 1281, 1292(1), and 1292(2)(A). Before examining the individual provisions, it is important to first consider the principles which govern statutory construction. As I explained recently in *Catholic Social Services v. Meese,* 664 F.Supp. 1378 (E.D.Cal.1987) (hereinafter "CSS"), "the Supreme Court has begun to refine the process of ascertaining Congressional intent and to evolve a kind of hier-archy of canons of statutory construction." *Id.* at 1382. The critical first step of the process is to apply the plain meaning rule. If the statutory language is clear and unambiguous, "that language must ordinarily be regarded as conclusive," *North Dakota v. United States,* 460 U.S. 300, 312, 103 S.Ct. 1095, 1102, 75 L.Ed.2d 77 (1983), for there is a "strong presumption that Congress expresses its intent through the language it chooses." *INS v. Cardoza-Fonseca,* — U.S. —, 107 S.Ct. 1207, 1213 n. 12, 94 L.Ed.2d 434 (1987). For that reason, when Congress defines a term in a statute, that term is plain, and application of the plain meaning rule requires that term to be given its statutorily defined meaning (see footnote 4). When the language is plain, no further construction of a statute is required, for there is nothing to construe. *See id.* 107 S.Ct. at 1220–21 n. 29.

▆ The interpretation of a statute by an agency is entitled to no particular deference when the meaning of the statute is clear; indeed, the court need not consider the agency interpretation unless the statutory language and legislative history reveal an ambiguity. *CSS,* 664 F.Supp. at 1382–83. On the other hand, if the legislative history reveals a clearly expressed legislative intention contrary to the plain words of the statute, or if the language of the statute is not plain, the statute is ambiguous. Under such circumstances, resort may be had to textual and extrinsic aids to construction. *Id.* Accordingly, when there is an ambiguity, the administrative interpretation becomes relevant, *see Deukmejian v. United States Postal Service,* 734 F.2d 460, 462 (9th Cir.1984); *Diaz v. INS,* 648 F.Supp. 638, 644–45 (E.D.Cal.1986), and while not conclusive, if consistent with the statutory purpose and linguistically reasonable, is entitled to deference. *Flint v. State of California,* 594 F.Supp. 443, 448 (E.D.Cal.1984).

---

**3.** The uncertainty is caused largely by the APA itself, which sets out two distinct standards, "substantial evidence," 5 U.S.C. § 706(2)(E), and "arbitrary and capricious," 5 U.S.C. § 706(2)(A), potentially applicable to factual determinations made by the agency. *See* 5 K. Davis, *Administrative Law Treatise* §§ 29.1, 29:7 (2d ed. 1984). Because the issues in the instant matter are purely legal, I need not further address the question.

**1432**

### C. *Principles of Regulatory Construction*

In addition to arguing about the meaning of the three statutory provisions contained in the Clean Water Act, the parties take different positions on the meaning of certain EPA regulations. The guiding principles for construing administrative regulations are similar to the rules governing statutory construction. As with statutes, the fundamental concern of the court in construing an administrative regulation is "to effectuate the central purpose of the enacting body." *Diaz v. INS,* 648 F.Supp. 638, 644 (E.D.Cal.1986). The plain meaning of the regulation is ordinarily dispositive. *See id.* Where the language of the regulation is ambiguous, the interpretation of the agency responsible for enacting the regulation is entitled to significant deference unless the interpretation is "plainly erroneous or inconsistent with the regulation" or authorizing statute. *See United States v. Larionoff,* 431 U.S. 864, 872–73, 97 S.Ct. 2150, 2155–56, 53 L.Ed.2d 48 (1977).

### D. *Resolution of the Motions*

The EPA Regional Administrator gave three reasons for concluding that the agency was entitled to recover the money that it had dispersed to the District for the acquisition of mitigation wetlands. There is, however, a single premise that underlies each of the three reasons, and that is that the EPA was not authorized by statute or regulation to make grant funds available for the purchase of land used for mitigation purposes. With all due respect, I conclude that the EPA Regional Administrator was plainly in error when he reached that conclusion.

#### 1. *The Law—The Construction Grants Program*

To further the "development and implementation of waste treatment management plans and practices," 33 U.S.C. § 1281(a), the Clean Water Act authorizes the EPA to make grants available "to any State, municipality, or intermunicipal or interstate agency for the construction of publicly owned treatment works." 33 U.S.C. § 1281(g)(1). The construction grants program is part of a broad effort by the federal government to restore the quality of this country's waters by eliminating the discharge of pollutants into navigable waterways. *See* 33 U.S.C. § 1251(a); *see generally Fairview Township v. EPA,* 773 F.2d 517, 519–20 (3d Cir.1985).

The question in this case is whether the District's acquisition of mitigation wetlands constitutes the "construction of [a] ... treatment works" so as to make that acquisition grant-eligible. At first glance, it appears that the position taken by the EPA is on solid ground. Since mitigation wetlands are not used to treat waste, it would seem to follow that the development of wetlands does not qualify as the "construction of [a] ... treatment works." The EPA's argument falters, however, because Congress has defined both "treatment works" and "construction." In so doing, Congress has transformed the apple into the proverbial orange.[4] Thus, to resolve the question, I must apply the statutory definition of the phrase "construction of [a] ... treatment works."

#### (a) *"Treatment Works"—33 U.S.C. § 1292(2)(A)*

Under 33 U.S.C. § 1292(2)(A), "treatment works" is defined to mean

any devices and systems used in the storage, treatment, recycling, and reclamation of municipal sewage ... or necessary to recycle or reuse water at the most economical cost over the estimated life of the works, including intercepting sewers, outfall sewers, sewage collection systems, pumping, power, and other equipment, and their appurtenances; extensions, improvements, remodeling, ad-

---

4. "A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Perrin v. United States,* 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979). Conversely, Congress is perfectly free to define words in such a way that the words take on extraordinary or unusual meanings. In the United States Code, an apple can be an orange so long as Congress says that is what it is.

ditions, and alterations thereof; elements essential to provide a reliable recycled supply such as standby treatment units and clear well facilities; and any works, including site acquisition of the land that will be an integral part of the treatment process (including land used for the storage of treated wastewater in land treatment systems prior to land application) or is used for ultimate disposal of residues resulting from such treatment.

"Treatment works" also includes "any other method or system for preventing, abating, reducing, storing, treating, separating, or disposing of municipal waste, including storm water runoff, or industrial waste, including waste in combined storm water and sanitary sewer systems." 33 U.S.C. § 1292(2)(B).

The defendants' argument that mitigation wetlands are not treatment works cannot be gainsaid. Mitigation lands are neither "devices [nor] systems used in the storage, treatment, recycling, and reclamation of municipal sewage ... or necessary to recycle or reuse water," nor "extensions, improvements, remodeling, additions, and alterations thereof," nor "elements essential to provide a reliable recycled supply." *See* 33 U.S.C. § 1292(2)(A). Wetlands are not "works" of any kind, and they are neither "an integral part of the treatment process" nor "used for ultimate disposal of [treatment] residues." *See id.* Finally, mitigation wetlands do not qualify as a "method or system for preventing, abating, reducing, storing, treating, separating, or disposing of municipal waste." *See* 33 U.S.C. § 1292(2)(B). In short, the lengthy definition of "treatment works" leaves no room for mitigation wetlands.

Nonetheless, the conclusion that mitigation wetlands are not treatment works is not dispositive. Although the wetlands purchased by the District are not "treatment works," the waste facility constructed by the District *is* a "treatment works." If the District's waste treatment plant is a "treatment works" within the meaning of the statute, the correct question is whether the acquisition and development of the new wetlands constitutes a "construction" of the waste treatment plant, not whether the wetlands are a treatment works. If the answer to the correct question is yes, the wetlands acquisition qualifies as a "construction of [a] ... treatment works," whatever the non-statutory meaning is of the phrase. The answer to the correct question turns on the sui generis statutory definition of "construction." [5]

### b. *"Construction"—33 U.S.C. § 1292(1)*

In examining section 1292(1), I begin with the language of the provision and then look to the legislative history of the statute. I then consider the relevant administrative regulations and practices, and briefly address the limited case law on the subject.

### (1) *The Words of the Statute*

The term "construction" ordinarily means the process of fabricating or building something.[6] The definition of "construction" in the Clean Water Act, however, is entirely different. Under 33 U.S.C. § 1292(1),

[t]he term "construction" means any one or more of the following: preliminary planning to determine the feasibility of treatment works, engineering, architectural, legal, fiscal, or economic investigations or studies, surveys, designs, plans, working drawings, specifications, procedures, field testing of innovative or alternative waste water treatment processes

---

5. Notably absent from the papers of the government is any serious discussion regarding the definition of "construction." The EPA addresses the definition in a single paragraph and footnote in its reply brief. The EPA argues incorrectly that the term "construction" could not include mitigation wetlands because the purchase of mitigation lands is expressly prohibited by section 1292(2)(A). Section 1292(2)(A) does not mention mitigation lands. Moreover, the language of section 1292(2)(A) is inclusive, not exclusive.

6. "Construction" is defined in Webster's Third New Int'l Dictionary (1966) as "the act of putting parts together to form a complete integrated object: fabrication ... the science or study of building or erection[;] something built or erected."

and techniques meeting guidelines promulgated under section 1314(d)(3) of this title, *or other necessary actions,* erection, building, acquisition, alteration, remodeling, improvement, or extension of treatment works, or the inspection or supervision of any of the foregoing items.

33 U.S.C. § 1292(1) (emphasis added). It is apparent from the language of the provision that Congress intended to give the term "construction" an exceedingly broad reach. In addition to the actual building of a treatment works, the definition encompasses virtually every act related to the process of building a treatment works. A telling example of the breadth of the definition is the inclusion of such items as "legal, fiscal, or economic investigations or studies." Critical to this case, Congress also included within the definition the phrase "or other necessary actions." Given the scope of the definition, it is plain that the phrase "or other necessary actions" is meant to include all steps that are essential to the building of a treatment works.[7]

The sweeping definition is not limited by the doctrine of *ejusdem generis.* "Under the rule of *ejusdem generis,* where general words follow an enumeration of specific items, the general words are read as applying only to other items akin to those specifically enumerated." *Harrison v. PPG Industries, Inc.,* 446 U.S. 578, 588, 100 S.Ct. 1889, 1895, 64 L.Ed.2d 525 (1980). The rule does not apply in this case for three reasons. First, the doctrine "is only an instrumentality for ascertaining the correct meaning of words when there is uncertainty" and does not apply when the meaning of the language is plain. *Id.*[8] In the context of the construction grants program for

treatment works, the meaning of the phrase "other necessary action" is plain. Moreover, application of the doctrine cannot be used to create an ambiguity "which is not inherent in the language employed by Congress, or at least resulting from examination of the legislative history." *CSS,* 664 F.Supp. 1378, 1382 (E.D.Cal. 1987). Finally, the rule does not apply when terms are connected in the disjunctive by the conjunction "or"; in such a case, canons of construction require that the terms be given their separate and distinct meanings. *Garcia v. United States,* 469 U.S. 70, 73, 105 S.Ct. 479, 481, 83 L.Ed.2d 472 (1984). The phrase "other necessary actions" is connected in the disjunctive to the terms that precede it.[9]

I conclude that section 1292(1) means what it says, and that the word "construction" encompasses all actions found to be "necessary" for the building of a treatment works.

#### (2) *The Legislative History*

When the meaning of a statute is plain, the legislative history becomes relevant only to the extent it expresses an intent that is clearly contrary to the statute's plain meaning. *North Dakota v. United States,* 460 U.S. 300, 312, 103 S.Ct. 1095, 1102, 75 L.Ed.2d 77 (1983); *CSS,* 664 F.Supp. 1378, 1382 (E.D.Cal.1987). The legislative history of the Clean Water Act does not plainly demonstrate that Congress meant anything other than what the plain words of the statutory definition seem to mean. Specifically, the history of the construction grants program does not indicate that Congress meant to exclude from the program either the costs of necessary mitigation measures or the purchase of lands

---

**7.** "Necessary" means those things "that cannot be done without; that must be done or had; absolutely required; essential, indispensable." Webster's Third New International Dictionary (1966).

**8.** As I have recently explained, the evolving "hierarchy of canons of construction" requires resort first to "the plain meaning rule, followed by examination of the legislative history." If ambiguity remains, "a court may resort to other textual means of construction, ending with resort to extrinsic aids." *CSS,* 664 F.Supp. 1378,

1382 (E.D.Cal.1987). In the instant case, the doctrine of ejusdem generis is a "textual means of construction" while administrative construction of the statute is an "extrinsic aid."

**9.** The terms that follow the phrase, such as "erection, building, acquisition, alternation," do not limit the phrase "or other necessary actions" either, since as noted in the text the rule of *ejusdem generis* only applies where the general term is preceded by more specific terms.

necessary for the development of an approved treatment works.

EPA argues to the contrary. The EPA points to a 1971 report which supposedly supports its position. In that report, the Senate explains that the reference to land in the definition of "treatment works" includes

> only ... those lands which physically interact with the wastewater or pollutants removed therefrom. Lands which are merely a site for the placement of buildings or equipment are not considered to be a part of the treatment process, and are not included in the cost of construction.

S.Rep. No. 414, 92d Cong., 1st Sess. at 40 (1971), U.S.Code Cong. & Admin.News 1972, p. 3668, *reprinted in* SENATE COMM. ON PUB. WORKS, 93d CONG. 1st SESS., LEGISLATIVE HISTORY ON THE WATER POLLUTION CONTROL ACT AMENDMENTS OF 1972, at 1458 (1973).

The report, while having some bearing on the issue at bar, does not persuade me that the purchase of land is not generally eligible for assistance under the construction grants program. Certainly, it does not demonstrate a Congressional intent which is clearly contrary to the plain words of the statutory definition of "construction." The report only addresses the definition of "treatment works." As I discussed earlier, I agree with the EPA that mitigation wetlands are not "treatment works." The question, however, is not whether the mitigation lands are "treatment works," but whether the acquisition of new wetlands qualifies as a "necessary action" within the meaning of "construction." The Senate report does not shed any direct light on the latter question. Moreover, while the passage suggests that Congress intended to preclude funding for certain land purchases, mitigation wetlands are not mentioned. It is clear, of course, that the wetlands acquired by the District are not "[l]ands which are merely a site for the placement of buildings or equipment." In short, the Senate report does not clearly contradict the plain meaning of the phrase "other necessary actions" as used in the definition of "construction."

The EPA also relies on a statement made during the course of the House debate on the 1977 amendment to the Federal Water Pollution Control Act, the predecessor to the Clean Water Act. The amendment enlarged the definition of "treatment works" to include land used for the storage of treated wastewater in land treatment systems prior to land application.[10] In commenting on the amendment, Representative Roberts stated:

> Excluded from eligibility for [grant] assistance are collector sewers, interceptors, storm or sanitary sewers or the separation thereof, and major sewer rehabilitation. However, costs of the acquisition of land, *otherwise not eligible* under [the 1972 Act], will be eligible where the land is to be used for the storage of treated wastewater prior to its application to the land in land treatment systems.

123 Cong.Rec. 38,953 (1977) (emphasis added).

It is unclear exactly what Representative Roberts had in mind when he referred to the "acquisition of land, *otherwise not eligible*." Since certain land acquisitions were explicitly included within the 1972 definition of treatment works, the passage does not support the EPA's view that all purchases of land were not eligible for funding under the program. It is more likely that the statement reflects the Congressman's belief that land purchased for storage of treated wastewater had not previously been eligible. In any event, as with the Senate report discussed previously, the comments are made in the context of the definition of "treatment works." They do

---

10. Prior to the 1977 amendment, "treatment works" encompassed a "site acquisition of the land that will be an integral part of the treatment process or is used for ultimate disposal of residues resulting from such treatments." The amendment expanded the definition to include within the meaning of "site acquisition" land to be used for the storage of treated wastewater prior to its application to the land in land treatment systems. 123 Cong.Rec. 38,953 (1977) (statement of Representative Roberts).

not enlighten the court as to the meaning of the term "construction." [11]

Finally, the EPA refers to the legislative history of the 1981 amendments to the Clean Water Act. In that year, the House proposed an amendment which would have *required* the "EPA to make a grant to mitigate adverse impacts arising from construction of a grant eligible treatment works ... if the State determines ... that the proposed works are grant eligible and that the step II construction grant on the underlying grant eligible treatment works was made no later than February 1, 1981." H.Conf.Rep. No. 97–408, 97th Cong., 1st Sess. 23 *reprinted in* 1981 United States Code Cong. & Ad. News 2656, 2666. Congress rejected the House version of the bill, although it ultimately enacted a measure mandating that EPA provide a grant for mitigation purposes to a project in Eureka, California. *See* 33 U.S.C. § 1281(m)(2).

EPA argues that the history of the 1981 amendments demonstrates that grant funding for the purchase of mitigation wetlands is precluded unless Congress expressly authorizes the grant. The EPA's interpretation of the amendments is wide of the mark. The legislative history of the amendments reveals only two things: first,

that Congress decided not to *require* the EPA to provide grant funds every time the construction of a treatment works destroyed natural wetlands; and second, that Congress decided to provide a specific grant for mitigation purposes at a certain project in Eureka, California. The legislative history does not support the position that the EPA lacked *discretion* to fund the acquisition of mitigation wetlands when the purchase of mitigation wetlands are a prerequisite to the building of a treatment works.[12] *See Hotel Employers Ass'n v. Gorsuch*, 669 F.2d 1305, 1308 (9th Cir.1982) (when Congress decides not to act on a proposed bill, inaction may be "due to the belief that the point was already covered by existing law"). If anything, the grant for the Eureka project confirms my view that the purchase of mitigation wetlands is grant-eligible.[13]

I conclude that the legislative history does not plainly evince a Congressional intent to exclude the funding of mitigation wetlands from the construction grants program.

#### (3) *Administrative Interpretation*

Given that the statutory definition of the word "construction" is plain and uncontra-

---

**11.** To the extent the comment is a reflection on a previously enacted statute, it "cannot be accorded 'the weight of contemporary legislative history.'" *North Haven Board of Education v. Bell*, 456 U.S. 512, 535, 102 S.Ct. 1912, 1925, 72 L.Ed.2d 299 (1982). The views of legislators about previous legislation ordinarily form a poor basis for inferring the intent of the earlier Congress. *See Russello v. United States*, 464 U.S. 16, 26, 104 S.Ct. 296, 302, 78 L.Ed.2d 17 (1983). It is true that "[w]here 'an agency's statutory construction has been "fully brought to the attention of the public and the Congress," and [Congress] has not sought to alter that interpretation although it has amended the statute in other respects, then presumably the legislative intent has been correctly discerned.'" *North Haven Board*, 456 U.S. at 535, 102 S.Ct. at 1925. However, the rule only applies where Congress was informed in detail of the administrative interpretation, and such is not the case here. *Cf. id.* at 532, 102 S.Ct. at 1923 (Congress conducted six days of hearings to determine whether certain regulations were "consistent with the law and with the intent of the Congress in enacting the law").

**12.** It is clear that the EPA is not required to make grants for mitigation purposes. The question is whether the EPA is *authorized* to make

such grants. If authorized, it is of course within the EPA's discretion whether to actually make the grant. The District's argument that the statute requires the EPA to fund the purchase of mitigation land is, to put it generously, unconvincing.

**13.** In the Eureka project, the City of Eureka accepted a step II grant award after having been informed by the State Board that the acquisition of 139 acres of mitigation wetlands and a wildlife area was grant-eligible. Subsequently, the EPA overturned the State Board's determination and informed the City that the acquisition of the 139 acres was not grant eligible. In his comments regarding the particular grant, ultimately enacted as 33 U.S.C. § 1281(m)(2), Representative Don Clausen said that the EPA had incorrectly overturned the State Board's decision. Representative Clausen explained that the "cases involve EPA's refusal to abide by the grant eligibility determination made by the duly appointed agency of a State having construction grants program delegation responsibilities.... EPA erred in refusing to abide by the [State Board's] grant eligibility determination." 127 Cong.Rec. H9820 (daily ed. Dec. 16, 1981).

dicted by the legislative history, it would appear to be unnecessary to consider the administrative interpretation. *CSS*, 664 F.Supp. 1378, 1383 (E.D.Cal.1987). Nonetheless, since the relevant regulations do not require a result inconsistent with the statute's plain meaning, I briefly examine them for such light as they may cast on the issue.

The EPA has promulgated a number of regulations which attempt to explain which project costs are eligible for funding by the EPA under the Clean Water Act. *See* 40 C.F.R. § 30.705. The regulations divide costs into those which are allowable, 40 C.F.R. § 35.940–1, those which are not allowable, 40 C.F.R. § 35.940–2, and those which are allowable only if approved, C.F.R. § 35.940–3.

The EPA principally relies upon section 35.940–2(h) in support of its position that funding for the purchase of mitigation lands is not authorized. Section 35.940–2(h) provides that the costs for "site acquisition (for example, sewer rights-of-way, sewage treatment plantsite, sanitary landfills and sludge disposal areas)" are not eligible costs "except as otherwise provided in § 35.940–3(a)." Section 35.940–3(a) permits funding for acquisitions of land where the land is "an integral part of the treatment process" or "will be used for ultimate disposal of residues resulting from such treatment."

The EPA contends that 40 C.F.R. § 35.-940–2(h) demonstrates that funding for the purchase of land is not authorized unless the land is integral to the treatment process. Although not clearly spelled out, it is apparent that the EPA assumes that the term "site acquisition" in section 35.940–2(h) is synonymous with the term "land acquisition." Based on that assumption, the EPA reasons that an acquisition of land is not an allowable project cost unless the land is "an integral part of the treatment process" or "will be used for ultimate disposal of residues resulting from such treatment." 40 C.F.R. § 35.940–3(a). Because

mitigation wetlands are not part of the waste treatment process or used for disposal, the argument goes, the acquisition thereof is not an eligible cost.

The EPA's argument goes awry at its premise. Nothing in the regulations suggests that a "site acquisition" includes every purchase of land. To the contrary, the regulations demonstrate that every purchase of land is *not* a "site acquisition." Section 35.940–2(h) excludes funding for site acquisitions except as provided by section 35.940–3(a). If every land acquisition were a "site acquisition," the only land that would be grant-eligible would be land identified in section 35.940–3(a). Such is not the case. The regulations explicitly permit funding for land not described in section 35.940–3(a), including land "for storage of treated wastewater in land treatment systems before land application," 40 C.F.R. § 35.940–3(b), and land "for composting or temporary storage of compost residues which result from wastewater treatment...." 40 C.F.R. § 35.940–3(c).

I find the regulations largely incomprehensible. To say the least, it is not clear what the regulations mean by "site acquisition." In view of 40 C.F.R. §§ 35.940–3(b) and (c), however, it *is* clear that not every purchase of land is a "site acquisition."[14] Thus, I cannot agree with the EPA that the purchase of mitigation wetlands is prohibited by section 35.940–2(h). As far as I can tell, section 35.940–2(h) has nothing to do with the acquisition of wetlands.

■ The practice of the EPA does not shed light on the issue either. A current agency practice may constitute an official interpretation, but is entitled to deference only if the agency has consistently taken the same position. *Morton v. Ruiz*, 415 U.S. 199, 237, 94 S.Ct. 1055, 1075, 39 L.Ed.2d 270 (1974); *McCoog v. Hegstrom*, 690 F.2d 1280, 1284 (9th Cir.1982). The EPA's position with respect to both the funding of mitigation measures in general and the purchase of mitigation wetlands in particular has been far from consistent.

**14.** It is not insignificant that the EPA does not address the relevance of sections 35.940–3(b) and (c).

This case is illustrative. After approving the grant for the acquisition, presumably after at least a preliminary determination that the grant was authorized, the EPA changed its mind and concluded that the grant was not authorized. The evidence presented by the District also demonstrates that the EPA has funded other mitigation measures, including the acquisition of land to be used as a buffer zone around disposal areas.

I conclude that the EPA's interpretation of the statute as reflected in its regulations and its practices is not entitled to deference, and even if it were so entitled, the interpretation is not reasonable. In fact, the position taken by the EPA appears to be inconsistent with the plain words of the statute.

### (4) *Caselaw*

However plain a statute's words may be to me, as a subordinate court I am bound by the construction of a statute by the Supreme Court or the Ninth Circuit. *See Brown v. Baden,* 815 F.2d 575, 576 (9th Cir.1987). In the instant case, no such binding construction exists. The only published opinion that has addressed an issue similar to the one tendered here is *City of Columbia, South Carolina v. Costle,* 710 F.2d 1009, 1014 (4th Cir.1983).

In *Costle,* the EPA awarded a construction grant under the Clean Water Act to the city to build a sewer line to a wastewater facility. The grant was conditioned on the city's purchase of easements or rights-of-way for the sewer line. However, the EPA made it clear from the start that it would not pay for the cost of buying the easements or rights-of-way. The city sued EPA, arguing in effect that the Clean Water Act required the EPA to make a grant for the purchase of the easements or rights-of-way. The court of appeals rejected the city's argument. The court reasoned that under section 1292(2)(A), "treatment works" include only "site acquisition of the land that will be an integral part of the treatment process." *Id.* at 1014. The court concluded that because the rights-of-way and easements were not integral to

the treatment works, they were not "treatment works" within the meaning of the statute and, thus, the city was not entitled to a grant.

*Costle* does not aid the EPA's position here. First, the question in *Costle* was not whether the EPA was authorized to provide a grant for a certain acquisition, but whether EPA was *required* to provide the grant. The Fourth Circuit was plainly correct in finding that the Clean Water Act had no such requirement. The question here is not whether the EPA was compelled to provide the District with a grant, as in *Costle,* but whether the grant was authorized. Second, funding of the purchase of sewer rights-of-way is expressly prohibited by 40 C.F.R. § 35.940–2(h). Finally, to the extent that the court found that the statute does not authorize funding for the acquisition of land unless the land is an integral part of the treatment plant, the conclusion is not persuasive. The Fourth Circuit addressed only whether the purchase of the easements and rights-of-way fell within the definition of "treatment works." It did not discuss the definition of "construction," which, as I explained above, is the key question.

### 2. *Application of the Law to this Case*

After examining the statutory language, the legislative history, the administrative regulations and practices, and the case law, I conclude that Congress used the word "construction" expansively, and that "construction" includes all steps found necessary for the building of a "treatment works." I must now consider whether the acquisition in question was such a necessary action.

■ The record shows that every state and federal agency involved in or required to approve the construction of the plant concluded that the District would have to provide for artificial wetlands to compensate for the loss of native wetlands. The acquisition of the wetlands was necessary to receive permit approvals from the various agencies, and in fact, the EPA grant for the project was itself conditioned upon the acquisition of the new wetlands. Un-

der these circumstances, the District's acquisition of mitigation wetlands was without peradventure of a doubt a prerequisite to the completion of the treatment works and, therefore, a "necessary action." Since the purchase of the wetlands was a "necessary action" with respect to the building of the treatment works, the acquisition qualifies as the "construction" of a treatment works within the meaning of the statute, as strange as that might appear if we were considering the ordinary meaning of the term. Accordingly, the EPA was authorized to make a grant to the District for the purchase of the mitigation wetlands. The decision of the EPA to the contrary was plainly erroneous.[15]

The parties have raised a number of other issues in their motions for summary judgment. The EPA argues that all grant funding decisions are made subject to EPA's right to audit federally reimbursed costs and to recover reimbursements made by EPA for unallowable costs. The issue is foreclosed by the determination above that the grant in issue was authorized by the Act and not forbidden by the regulations.

The EPA also questions the scope and location of the land acquisition. The issues may not be raised at this juncture. The underlying basis for the EPA's decision to seek recovery of the funds was that the Clean Water Act did not authorize the EPA to fund the purchase of mitigation wetlands. An administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its power were those upon which its action can be sustained. *FPC v. Texaco, Inc.*, 417 U.S. 380, 397, 94 S.Ct. 2315, 2326, 41 L.Ed.2d 141 (1974). Put another way, an agency's action can only be upheld on the basis articulated in the agency's decision.

For all of the above reasons, the EPA's motion is DENIED, and the District's motion is GRANTED. The EPA may not recover the funds it dispersed to the District for the purchase of mitigation wetlands, and is hereby enjoined from seeking to recover those funds, by offset or otherwise.

IT IS SO ORDERED.

---

**15.** Given this disposition, I need not resolve the question of whether the Administration's conclusion embodied in 40 C.F.R. § 35.940–1(h) is entitled to deference. *See Save Lake Washington v. Frank,* 641 F.2d 1330, 1334 (9th Cir.1981) (NEPA sets forth significant substantive goals, but its mandate is essentially procedural).