### BIGELOW v. FORREST.

1. The act of March 23d, 1863, "relating to *Habeas Corpus*, and regulating judicial proceedings in certain cases," applies only to suits for acts done or omitted to be done during the rebellion.
2. It does not apply to actions of ejectment.
3. The act of July 17th, 1862, "to suppress insurrection, to punish treason and rebellion, to seize and confiscate the property of rebels, and for other purposes," and the joint resolution of the same date explanatory of it, are to be construed together.
4. Under the two thus construed all that could be sold by virtue of a decree of condemnation and order of sale under the act was a right to the property seized, terminating with the life of the person for whose offence it had been seized.
5. The fact that such person owned the estate in fee simple, and that the libel was against *all* the right, title, interest, and estate of such person, and that the sale and marshal's deed professed to convey as much, does not change the result.

ERROR to the Supreme Court of Appeals of Virginia, the case being this:

Congress, by an act commonly called the Confiscation Act, passed July 17th, 1862,* during the late rebellion, "to suppress insurrection, to punish treason and rebellion, to seize and confiscate the property of rebels, and for other purposes," after enacting that treason should be punished with death, provides:

"*Section* 5. That to insure the speedy termination of the present rebellion, it shall be the duty of the President of the United States to cause the seizure of all the estate and property . . . of the persons hereinafter named, and to apply and use the same, and the proceeds thereof, for the support of the army of the United States."

This 5th section proceeded to name six classes of persons whose property should be liable to seizure, and first among them:

"Any person hereafter acting as an officer of the army or

---

* 12 Stat. at Large, 589.

navy of the rebels in arms against the government of the United States."

And the last clause of it enacts that

"It shall be a sufficient bar to any suit brought by such person for the possession or use of such property, . . . to allege and prove that he is one of the persons described in this section."

The act proceeds:

"*Section* 7. That to secure the condemnation and sale of any such property, after the same shall have been seized, so that it shall be made available for the purpose aforesaid, proceedings *in rem* shall be instituted in the name of the United States, in any District Court thereof, or any Territorial court, within which the . . . property above described may be found; . . . which proceedings shall conform, as nearly as may be, to proceedings in admiralty or revenue cases; and if said property . . . shall be found to have belonged to a person engaged in rebellion, . . . the same shall be condemned as enemies' property, and become the property of the United States, and may be disposed of as the court shall decree, and the proceeds thereof paid into the treasury of the United States for the purposes aforesaid.

"*Section* 8. That the several courts aforesaid shall have power to make such orders, establish such forms of decree and sale, and direct such deeds and conveyances to be executed and delivered by the marshals thereof, where real estate shall be the subject of sale, as shall fitly and efficiently effect the purposes of this act, and vest in the purchasers of such property good and valid titles thereto.

"*Section* 14. That the courts of the United States shall have full power to institute proceedings, make orders, and do all other things necessary to carry this act into effect."

By the latter clause of a "joint resolution explanatory "* of this act, passed on the same day with it, it was resolved by Congress that no punishment or proceedings under the act should be "so construed as to work a forfeiture of the real estate of the offender *beyond his natural life.*"

It was a part of the history of this legislation of July 17th,

---

* 12 Stat. at Large, 627.

1862, that the then President, Mr. Lincoln, immediately after the passage of the *act* by both houses of Congress, had prepared the draft of a message objecting to provisions that might result " in the divesting of title forever," and suggesting or showing that the bill, as Congress had passed it, was in conflict with that clause of the Constitution, which ordains that " no attainder of treason shall work corruption of blood or forfeiture, except during the life of the person attainted ;"* that before his message was presented to Congress, the joint resolution, above quoted, was passed to remove his objections; and that the President, in a message of July 17th, 1862, mentioned, that before he was informed of the resolution, he had prepared the draft of a message, stating objections to the bill becoming a law; a copy of which draft he submitted; and also mentioned that, considering the act of Congress, and the joint resolution explanatory thereof, as substantially one, he approved and signed both.

Under this act, above quoted, as appeared by a case ᴀgreed on and stated, in the nature of a special verdict, the District Attorney of the United States for the Eastern District of Virginia, in September, 1863, caused a tract of land in the eastern part of Virginia, of which a certain French Forrest (a person acting as an officer of the navy of the so-called Confederate States, from July 1st, 1862, to April, 1865, and thus one of the persons described in the 5th section of the above quoted act), was *seized and possessed in fee,* to be seized. A libel was afterwards, on the 9th November in the same year, filed on behalf of the United States, in accordance with the act, in the District Court of the district just named, " against *all the right, title, and interest, and estate of the said French Forrest, in and to the said tract of land.*" The said libel proceeded to judgment in accordance with the act, and on the 9th of November, 1863, an order of condemnation was made by the court, by which it was decreed that the clerk should issue a *venditioni exponas* to the

---

* Art. 3, § 3, clause 2.

marshal, and that the property described in the libel be sold by the marshal of the district, for cash, to the highest bidder, and that he execute a deed to the purchaser for the same.

In pursuance of the decree the land was publicly sold, and knocked off on the 10th July, 1864, to one Buntley, to whom the marshal made a deed reciting the *venditioni.* Buntley's rights under the sale became afterwards vested in a certain Bigelow. Forrest died intestate November 24th, 1866, and his only child and heir-at-law, Douglass Forrest—whom the cases agreed on stated was "one of the persons described in said section 5th, that is to say, who acted as an officer of the army and navy of the so-called Confederate States, from and after the passage of the said act till April, 1865,"—brought an action of *ejectment,* on the 1st of April following, in the Circuit Court of Fairfax County, one of the State courts of Virginia, against Bigelow, to recover the land, averring seizure in himself on the 1st of January, 1867.

The defendant having pleaded to issue, on the 8th day of November, 1867, filed his petition for the removal of the cause into the Circuit Court of the United States, under the provisions of the 5th section of the act of Congress of March 3d, 1863,* entitled "An act relating to habeas corpus, and regulating judicial proceedings in certain cases."

This act thus provides:

"*Section* 4. That any order of the President or under his authority, made at any time *during the existence of the present rebellion,* shall be a defence in all courts to any action or prosecution, civil or criminal, pending or to be commenced, for any *search, seizure, arrest* or *imprisonment* made, done, or committed, or acts omitted to be done under and by virtue of such order or under color of any law of Congress.

"*Section* 5. That if any suit or prosecution, civil or criminal, has been or shall be commenced in any State court against any officer, civil or military, or against any other person for any *arrest or imprisonment made, or other trespasses or wrongs done or*

---

* 12 Stat. at Large, 755.

*committed, or any act omitted to be done at any time during the present rebellion,* by virtue or under color of any authority derived from or exercised by or under the President of the United States, or any act of Congress; and the defendant shall . . . . . . in the court in which such suit or prosecution is pending file a petition, stating the fact verified by affidavit, for the removal of the cause for trial at the next Circuit Court of the United States, to be holden in the district where the suit is pending, and offer good and sufficient surety for his filing in such court, on the first day of its session, copies of such process and other proceedings against him, &c., . . . . it shall then be the duty of the State court to accept the surety and proceed no further in the cause or prosecution. . . . . And copies being filed, as aforesaid, in such court of the United States, the cause shall proceed therein in the same manner as if it had been brought in said court by original process."

Bigelow's petition for removal complied with the requisitions of this statute, respecting the form of procedure for removal.

The prayer of the petition was, however, denied, and, by agreement of the parties, the case already set forth, was stated in the nature of a special verdict, upon which the court gave judgment for the plaintiff. A petition was then presented to the District Court of Appeals praying for a writ of supersedeas to the judgment, and assigning as errors that the Circuit Court denied the motion to remove the cause into the Circuit Court of the United States upon the petition which had been filed for such removal, and also that the judgment was not warranted by the facts found in the agreement made in lieu of a special verdict, and that it was against the law and the evidence. The District Court of Appeals, however, being of opinion that no error had been committed in the cause by the Circuit Court of Fairfax County, refused the supersedeas. A petition was then presented by the defendant to the Supreme Court of Appeals of the State, complaining of the action of the District Court of Appeals, and praying for a writ of supersedeas to the judgment, assigning the same errors which he had assigned in his petition to the

District Court. The application to the Supreme Court was unsuccessful. The supersedeas was denied, and thereupon the present writ of error was sued out. There were two questions, therefore, presented by the record:

1st. The question whether there was error in the refusal of the State Circuit Court to allow a removal of the cause into the Federal court; for if there was not, then obviously there was no ground for complaint that the Court of Appeals had refused a supersedeas to the judgment because such removal had not been allowed.

2d. The question whether there was error in the judgment of the court upon the merits of the case.

*Messrs. Poland and Willoughby, for Bigelow, the plaintiff in error:*

1. The court erred in denying the motion to remove the cause, for the action asserted a trespass or *wrong to have been committed,* and so fell within the act of March 3d, 1863.

The act on which the ejectment was founded was at least committed under color of an act of Congress, and also under color of an order given by authority of the President of the United States.

2. The decree of the District Court of the United States condemning and confiscating *all the right, title, and interest* of the original owner, under the act of July 17th, 1862, or Confiscation Act, is binding upon all but appellate courts. Such decree cannot be collaterally assailed, especially by a State court, except by showing that such District Court did not have *jurisdiction.*

It is agreed that the land was seized *under the act.* Proceedings were had " in accordance *with said act.*" The act prescribes that the " proceedings shall conform as nearly as may be to proceedings in admiralty or revenue cases." Regularity in all that was done is of course to be inferred.

By the act *all* the property is to be seized. No other seizure would have been proper under the act. A life-estate could not have been seized, for the act did not direct it, nor did the owner have a life-estate. The officer could not

make a seizure of separate interests.    He is to take *the property belonging to the person.*

3. Douglass Forrest, plaintiff below, is admitted to have been, like his father was, one of the persons described in the fifth section of the Confiscation Act.    The latter part of that section declares that "it shall be a sufficient bar to any suit brought by such person for the possession or the use of such property, or any of it, to allege and prove that he is one of the persons described in this section."    No amount of argument could show more clearly that Douglass Forrest cannot maintain this action, than this statement in the law itself. It is decisive of this whole case.

4. The decree of the District Court, confiscating *all the right, title, and interest* of the original owner, was authorized by the law.    This is not a proceeding in the nature of a bill of attainder.    The clause of the Constitution concerning this subject had reference to bills of attainder which were common to the English Parliament, and had often been resorted to by several of the colonial legislatures during the revolution, by which it often happened that the estates of persons were confiscated *after their death*, and without conviction or trial, and often when such estates had passed into the hands of innocent holders.    The true construction of this clause is that no attainder of treason should work a forfeiture *except during* the life of the person attainted; that is, that it should be done during his life.    But this limitation upon *bills of attainder* does not apply to proceedings in courts, in individual cases, where there are regular trials and formal proceedings in which the individual has full opportunity to defend.

The last clause of the joint resolution, explanatory of the Confiscation Act, was passed out of superfluous caution to keep the act within the limits of the Constitution.    It employs the very language of the Constitution, except in one word, which must have been inserted inadvertently in the hurry attending the passing of many resolutions with this, upon the last day of a long session.    It was inserted because of the suggestion of the President, and because of his great desire to keep within the bounds of the Constitution.    But

neither the President nor Congress had fully considered the effect of the clause of the Constitution.

Any other construction of the real intention of Congress than that which we give it, would defeat the object of the bill, which was to raise money for the support of the army. The life of a traitor, liable to be executed for his crime, especially if the government could get him into custody, might be supposed to be very short. In any event the tenure of a mere life-estate would be so uncertain, that but very little money could be raised upon it. Such estates would not be improved, and instead of building up the country with loyal men upon these estates, as was contemplated, the tendency would be to destroy and impoverish it. Such a construction should not be given to an act of Congress if it is possible to give any other reasonable view of its intention.

Again, the act has at least equal force with the joint resolution. Both were approved by the President on the same day, and became a law at the same time. But the act says that *all* the property shall be seized, and the *same* shall be condemned. If the construction contended for by the defendant in error be allowed, then one exactly contradicts the other. If this be so we must give effect to that part of the bill which will be most consistent with its whole object. The word *forfeiture* is always spoken of as referring to *all* the interest a man has in property. It is one of the modes of *absolute conveyance* of real estate, and the word is never used in any other legal sense.*

If any other construction is given to the word forfeiture than that for which we contend, both in the Constitution and the act, and which is the universal legal construction of the word, we shall be led into difficulties which cannot be solved by any known rules of law. Can it be said to affect only the life-estate? But the interest of the owner is not that of a life-estate. He holds in fee. Can the legislature determine that an estate in fee shall be a life-estate, or that

---

* 2 Blackstone's Commentaries, 267.

it can be divided into one estate for life and some other interest? If it does make this separation there must be a remainder. Who is the holder of this? not his heirs, for there can be no heirs of the living. Besides a remainder must pass from the grantor at the same time with the creation of the particular estate, and must be supported by such particular estate, and if this fails the remainder falls with it. Can there be any inheritance from the estate which is left in the original owner? What kind of an estate is it that he has left which can *descend* to heirs? What is there left upon which an inheritance can be built, and what would be the name of such estate? The first rule of inheritance is, that the inheritance must be from a person who dies *seized* of the estate.

*Mr. Conway Robinson, contra.*

Mr. Justice STRONG delivered the opinion of the court.

The first question presented by the record for our consideration is whether there was error in the refusal of the State Circuit Court to allow a removal of the cause into the Circuit Court of the United States; for if there was not, there is no ground for complaint that the Supreme Court of Appeals had denied a supersedeas to the judgment because the removal prayed for had not been allowed.

The act of Congress of March 3d, 1863, under which the right to remove the cause was claimed, and under which the right existed, if it existed at all, enacted, in its fifth section, that if any suit or prosecution, civil or criminal, had been or should be commenced in any State court against any officer, civil or military, or against any other person, for any arrest or imprisonment made, or other trespasses or wrongs done or committed, or any act omitted to be done, at any time during the then existing rebellion, by virtue or under color of any authority derived from or exercised by or under the President of the United States, or any act of Congress, the defendant might effect the removal of the cause into the Circuit Court of the United States holden in the district where

the suit might be pending.   The act prescribed the course to be pursued in order to stay the proceedings in the State court and transfer the cause into the Federal tribunal.   It must be conceded that the plaintiff in error complied with the requisitions of the statute and its supplements respecting the form of procedure for a removal of his cause.   It remains, therefore, only to inquire whether the action was one which, under the act of Congress, could be removed.   It was an action of ejectment, commenced on the 1st of April, 1867, in which the plaintiff averred seizin in himself on the 1st day of January, 1867, and an entry by the defendant upon the land on the same day, and a withholding of the possession.   It might, perhaps, be sufficient to say that the act complained of, for which the suit was brought, was not, as described by the statute, " an arrest or imprisonment made," or " other trespass or wrong done or committed," or " an act omitted to be done *during the rebellion.*"   It is to suits for acts done or omitted to be done *during the rebellion* exclusively that the statute is applicable, and prior to January 1st, 1867, the rebellion had ceased to exist.

But we do not rest our judgment upon so narrow ground. In our opinion, the statute was not intended to apply to actions of ejectment.   It is manifest to us that Congress had in view only personal actions for wrongs done under authority or color of authority of the President of the United States, or of some act of Congress.   The fourth section made any order of the President, or under his authority, a defence in all courts to any action, civil or criminal, pending or to be commenced, for any search, seizure, arrest, or imprisonment made, done, or committed, or acts omitted to be done, under and by virtue of such order, or under color of any law of Congress.   The description of the causes of action mentioned in the fifth section is slightly different, not quite so detailed and specific, but it is evident that they were intended to be the same in both sections, as well as in the seventh, which prescribed a statutory limitation to suits and prosecutions   The specification, which all of these sections contain, of arrests and imprisonments, or, as in the fourth section, of searches,

seizures, arrests, and imprisonments, followed by more general words, justifies the inference that the other trespasses and wrongs mentioned are trespasses and wrongs *ejusdem generis,* or of the same nature as those which had been previously specified.   This construction is fortified by the consideration that the mischief against which the statute was intended to guard was manifestly the excitement and prejudice so likely, in times of intense popular feeling, to attend suits in local courts for personal wrongs; excitement and prejudice which might render a fair trial difficult, and which might, indeed, greatly embarrass the government.   The same mischiefs, in the same degree, could hardly have been expected to attend the trial of possessory actions for real estate.   The action of ejectment is not a personal action, and it appears to us not to be embraced in any of the classes mentioned in the fourth, fifth, and seventh sections of the act.

It follows that there was no error in disallowing the removal of this case into the Circuit Court of the United States.

We proceed next to inquire whether there was error in the judgment of the court upon the merits of the case.   The plaintiff below claimed the land as the sole heir of his father, French Forrest, who had been the owner down to September 1st, 1863, and who died intestate on the 24th day of November, 1866.   The defendant claimed as a purchaser under a decree of confiscation made by the District Court of the United States for the Eastern District of Virginia, on the 9th day of November, 1863.   French Forrest, the father of the plaintiff, was an officer in the navy of the Confederate States from July 1st, 1862, until April, 1865.   In September, 1863, under the act of Congress of July 17th, 1862, known as the Confiscation Act, the land in controversy was seized as his property, libelled in the District Court of the United States, and, on the 9th of November next following, a decree of condemnation was entered, and the land was ordered to be sold by the marshal.   Whether there was a *venditioni exponas* issued, as was ordered by the court, does not appear from the case stated (to which alone we can look for the

facts), except that the marshal's deed recites its issue.  We may assume that there was.  The property was sold at the marshal's sale and a deed was made to the purchasers.  Subsequently, and before the institution of this suit, the entire interest acquired by the purchase became vested in Bigelow, the defendant.  But what was that interest ?

The fifth section of the Confiscation Act of July 17th, 1862, enacted that it should be the duty of the President of the United States to cause the seizure of all the estate and property, moneys, stocks, credit, and effects, of certain persons described in six classes, and to apply and use the same and the proceeds thereof for the support of the army.  To one or more of these classes French Forrest belonged.  That it was not intended the mere act of seizure should vest the property seized in the United States is plain from the provisions of the seventh section, which enacted that to secure the condemnation and sale of any such property, after the same shall have been seized, proceeedings *in rem* should be instituted in a District Court, and that if it should be found to have belonged to a person engaged in rebellion, or who had given aid or comfort thereto, it should be condemned as enemy's property, and become the property of the United States, and that it might be disposed of as the court might decree.  Concurrently with the passage of this act, Congress also adopted a joint resolution explanatory of it, whereby it was resolved that no punishment or proceedings under the act should be so construed as to work a forfeiture of the real estate of the offender beyond his natural life.  It is a well-known fact in our political history that this resolution was adopted in consequence of doubts which the President entertained respecting the power of Congress to prescribe a forfeiture of longer duration than the life of the offender.  Be this as it may, the act and the resolution are to be construed together, and they admit of no doubt that all which could, under the law, become the property of the United States, or could be sold by virtue of a decree of condemnation and order of sale, was a right to the property seized, terminating with the life of the person for whose act it had been seized.  It fol-

lows, then, that the estate acquired by the purchaser at the marshal's sale expired on the 24th day of November, 1866, when French Forrest died.

It is argued, however, on behalf of the plaintiff in error, that the decree of confiscation in the District Court of the United States is conclusive that the entire right, title, interest, and estate of French Forrest was condemned and ordered to be sold, and that as his interest was a fee simple, that entire fee was confiscated and sold. Doubtless a decree of a court, having jurisdiction to make the decree, cannot be impeached collaterally; but, under the act of Congress, the District Court had no power to order a sale which should confer upon the purchaser rights outlasting the life of French Forrest. Had it done so it would have transcended its jurisdiction. And it attempted no such thing. The decree made has not that meaning. It is true, the cause in the District Court was entitled, " United States against all the right, title, interest, and estate of French Forrest in and to all that certain piece, parcel, or lot of land " (describing it); but all this is descriptive, not of quantity of estate, but of the subject of seizure, and that was land. The proceeding was required by the act of Congress to be *in rem*, and the decree condemned, not the estate of French Forrest, but, using its own words, " the real property mentioned and described in the libel." The marshal was ordered to sell the said property, the boundaries of which were given in the title to the decree. Had the purchasers looked at that decree (and knowledge of it must be attributed to them), they would have seen that it was a decree of confiscation of the land, and they were bound to know its legal effect. It is, therefore, a mistake to argue that the plaintiff below was permitted to impeach collaterally the decree under which the marshal's sale was made, or that the judgment of the court in this case impeaches it. The argument assumes what cannot be admitted, that the decree of the District Court established a confiscation reaching beyond the life of French Forrest, for whose offence the land was condemned and sold.

It has been further argued on behalf of the plaintiff in error, that the plaintiff below was barred against maintaining his suit by the latter clause of the fifth section of the act of 1862, which enacted that it shall be a sufficient bar to any suit brought by such person for the possession or use of such property or any of it, to allege and prove that he is one of the persons described in the section. The agreed statement of facts, in lieu of a special verdict, finds that the plaintiff is one of the persons described in said section fifth; but it immediately explains this by adding, " that is to say, he acted as an officer of the army and navy of the so-called Confederate States from and after the passage of said act until April, 1865." Was he, therefore, barred from maintaining the ejectment? The land was not seized or condemned for any act of his. He had no interest in it when it was declared forfeited. He could not have been heard in opposition to the decree of forfeiture. That proceeding was wholly *inter alias partes*. If, therefore, he is not at liberty to assert his claim, he is denied the right to his property without trial, without any procedure in due course of law, and the practical effect of the bar is to assure to the purchaser at the marshal's sale the enjoyment of the property after his right has expired, and to give him by estoppel a greater estate than he purchased. No construction of the act of Congress that works such results can be accepted. It is plainly against the true meaning of the act. We have already remarked that the act and the contemporaneous resolution must be construed together. The latter declares that the act shall not be construed to work a forfeiture of the real estate of the offender beyond his natural life. It can do this neither directly nor indirectly. The punishment inflicted upon him is not to descend to his children. His heritable blood is not corrupted. It is, of course, necessary to give such an interpretation to the words of the statute that they shall not contravene the declared intent of Congress. And this may be done and effect given to every part, by holding that the persons described in the fifth section, who are barred from bringing a suit for the possession or use of

such property, are those, and those only, whose property the President has caused to be seized. Such we think is the meaning of the clause barring suits.

This is all that need be said of the case. It is enough to show that, in our opinion, none of the errors assigned have any real existence. We do not care to speculate upon the anomalies presented by the forfeiture of lands of which the offender was seized in fee, during his life and no longer, without any corruption of his heritable blood; or to inquire how, in such a case, descent can be cast upon his heir, not-withstanding he had no seizin at his death. Such specula-tions may be curious, but they are not practical, and they can give no aid in ascertaining the meaning of the statute.

JUDGMENT AFFIRMED.