905 F.2d 1262
 31 ERC 1473, 58 USLW 2742, 20 Envtl.
L. Rep. 21,113
 SACRAMENTO REGIONAL COUNTY SANITATION DISTRICT, Plaintiff-Appellee,
v.
William K. REILLY, in his official capacity as Administrator
of the United States Environmental Protection
Agency; United States Environmental
Protection Agency,
Defendants-Appellants.
 No. 89-15621.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted April 17, 1990.
Decided June 8, 1990.
 
 Richard B. Stewart, Asst. Atty. Gen., David F. Levi, U.S. Atty., and Andrea M. Miller, Asst. U.S. Atty., Sacramento, Cal., J. Carol Williams, Carl Strass, Charles J. Sheehan, Attys., Dept. of Justice, Washington, D.C., for defendant-appellant E.P.A.
 L.B. Elam, County Counsel, Robert L. Pleines, Supervising Deputy Counsel, Office of the County Counsel, Sacramento, Cal., Henry L. Diamond, Richard S. Davis, David M. Friedland, Beveridge & Diamond, P.C., Washington, D.C., for plaintiff-appellee Sacramento Regional County Sanitation Dist.
 Appeal from the United States District Court for the Eastern District of California.
 Before FLETCHER and REINHARDT, Circuit Judges, and LIVELY, Senior Circuit Judge.*
 REINHARDT, Circuit Judge:
 
 
 1
 The Sacramento Regional County Sanitation District ("District") brought an action against the Environmental Protection Agency ("EPA") for declaratory and injunctive relief after the EPA disallowed a grant of funds to the District for the purchase of replacement wetlands. The purchase was required by federal and state agencies (including the EPA) with jurisdiction over the construction of the District's new solid wastewater treatment plant, as mitigation for the loss of the natural wetlands caused by the project. After initially approving the grant and disbursing the funds to the District, the EPA withdrew its approval and purported to disallow the grant on the ground that it did not have the statutory authority to grant funds for the purchase of mitigation wetlands. The District then filed this action, and the EPA filed a counterclaim seeking the return of the wetlands funds. Upholding the District's arguments, the district court held that the EPA did have the authority to make the grant in question--although it acknowledged that the agency would not have been required to do so--and enjoined the EPA from disallowing the grant.
 
 
 2
 On appeal, the EPA argues that: (1) Section 201 of the Clean Water Act, 33 U.S.C. section 1281, does not authorize federal funding of mitigation land purchases because any "site acquisition" must be an "integral part" of the treatment process and is not "construction" as defined in 33 U.S.C. section 1292(1), and (2) even if the EPA does have the authority to grant the District funds for the purchase of mitigation lands, the district court should have remanded the case to the EPA to allow it to exercise its discretion with respect to the District's request. In contrast, the District argues on appeal that: (1) the phrase "other necessary actions" in the definition of "construction" permits the EPA to authorize funding for replacement wetlands, and (2) since California's State Water Resources Control Board, the agent of the EPA, approved the funding and the EPA disbursed the grant, the EPA is now estopped from recovering the money. These questions--with the possible exception of the last, which we do not reach--are "pure issues of law" and subject to de novo review. United States v. Vogler, 859 F.2d 638 (9th Cir.1988), cert. denied, 488 U.S. 1006, 109 S.Ct. 787, 102 L.Ed.2d 779 (1989). We reverse the district court and hold that the language of section 1292(1) does not authorize federal funding for mitigation wetlands, but remand so that the district court may consider the estoppel question and any other issues that may properly be raised.
 
 I. FACTS
 
 3
 To further the "development and implementation of waste treatment management plans and practices," Title II of the Clean Water Act ("the Act") authorizes the EPA to make grants to states, municipalities, or other local governmental agencies for the "construction of publicly owned treatment works." 33 U.S.C. Sec. 1281(g)(1). These construction grants are part of a broad effort by the federal government to restore the quality of the nation's waters. See generally 33 U.S.C. Sec. 1251(a). In order to obtain federal funds for the construction of a treatment plant, the local applicant must submit plans, specifications, and cost estimates for each proposed project. 33 U.S.C. Sec. 1283(a). The EPA's approval of the application creates a grant agreement which is defined by Congress as a federal contractual obligation.[1]
 
 
 4
 In 1979, the EPA, through its state agent, California's State Water Resources Control Board ("State Board"), awarded the District a grant for the construction of a solids processing and wastewater treatment plant.[2] The initial grant did not provide funds for the acquisition of mitigation wetlands because the reviews required for this phase of the project had not yet been completed. However, between December 1979 and April 1980, the District sent at least five letters to the State Board requesting additional federal funds to acquire land on which to create artificial wetlands that would compensate for the loss of the natural wetlands to be filled by the project.[3] The federal and state agencies involved in the construction, including the EPA, the Army Corps of Engineers, the United States Fish and Wildlife Service, the California Department of Fish and Game, and the State Board, had approved the project on the condition that the District mitigate the wetlands loss by creating at least the same amount of acreage (approximately 48 acres) of compensating wetlands elsewhere. Sacramento Regional County Sanitation District v. Thomas, 668 F.Supp. 1427, 1428 (E.D.Ca.1987). On April 29, 1980, the State Board sent a letter to the District authorizing it to purchase land to serve as the site for the new wetlands. The letter explicitly noted that the land was only "potentially grant-eligible," and that "the authorization does not constitute a commitment to award a grant for reimbursement of the incurred costs, but will allow payment for the above authorized costs [including ... the costs of the wetlands compensation area] upon the subsequent award of a grant for this purpose." The State Board explained that the original grant could not, at that time, be increased to include the costs of the wetlands acreage because the EPA had deferred its obligation of fiscal year 1980 funds. Some time after receipt of this letter, the District commenced to purchase the land.[4] In November 1980, having made its fiscal year 1980 grant funds available for obligation, the EPA approved a grant amendment filed by the District for several land purchases including the mitigation land.[5]
 
 
 5
 In a December 5, 1980 meeting with members of the State Board, EPA representatives for the first time expressed their doubts concerning whether federal law permits the EPA to provide construction grants for the acquisition of mitigation wetlands. They said they doubted whether section 1281 grants could be used for that purpose. The EPA asserted its position unequivocally in a follow-up letter to the State Board on February 6, 1981, in which it concluded that mitigation land costs were not grant-eligible.[6] The letter urged the State Board to inform the District of the EPA's position, but neither the EPA nor the State Board did so.[7] Furthermore, on August 6, 1981, the State Board informed the District by letter that the District would shortly be receiving the "approved funds" although the final funding decision hinged on the results of the final audit. The State Board attached a form to the letter setting forth EPA approval of the request and listing the costs for land purchases approved for grant payment. Among the costs listed was that for the mitigation wetlands. On August 13, 1981, the EPA issued a United States Treasury draft to the District in the amount of $812,000, of which $438,202 represented the 75 percent federal share of the $584,270 actual cost of acquiring the land in question.
 
 
 6
 In 1982, state auditors under contract with the EPA conducted a final audit of the construction project.[8] For the first time, the District learned that the wetlands portion of the grant was being questioned. The auditors, in their final report, concluded that the costs of acquiring the wetlands were purely land costs and because they "were not an integral part of the treatment process," they were not allowable project costs. They disallowed them. The District strenuously objected to the disallowance, and thereafter, commenced the proceedings below.
 
 II. DISTRICT COURT PROCEEDINGS
 
 7
 After exhausting the administrative appeals process, the District filed an action in the district court, seeking declaratory and injunctive relief against the EPA. The EPA counter-claimed for the return of the wetlands acquisition grant funds. The court granted the District's motion for summary judgment, and enjoined the EPA from seeking to recover the funds. 668 F.Supp. at 1439. Although the court found that the "lengthy definition of treatment works" in 33 U.S.C. section 1292(2)(A)[9] left "no room for mitigation wetlands," it held that the EPA had authority to grant funds for the purchase of mitigation lands under the Act's definition of the term "construction."[10] Id. at 1433-34. According to the district court, the phrase "or any other necessary actions" indicated that "Congress intended to give the term 'construction' an exceedingly broad reach. In addition to the actual building of a treatment works, the definition encompasses virtually every act related to the process of building a treatment works." Id. at 1434. The district court concluded that since the acquisition of mitigation wetlands is essential to the building of the treatment works, it qualifies as one of the "other necessary actions" and can be funded under the definition of "construction."
 
 
 8
 The district court then briefly addressed the legislative history of the Act, but concluded that since the meaning of the word "construction" was plain and since nothing in the legislative history expressed an intent "clearly contrary to the statute's plain meaning," the legislative history was irrelevant.[11] It further stated that for the same two reasons, it would not give weight to the EPA's own interpretation of the statutory language in question.[12] The court did, however, examine the EPA's past conduct, and found that the agency had been inconsistent in its prior practices, and had in fact funded other mitigation measures such as buffer zones; it therefore concluded that in any event the agency's practices were not entitled to any deference. Finally, the district court distinguished a Fourth Circuit case that addressed an issue similar to the one presented here. In City of Columbia, South Carolina v. Costle, 710 F.2d 1009, 1014 (4th Cir.1983), the Fourth Circuit upheld the EPA's denial of funding for sewer easements purchased as part of constructing a wastewater treatment work on the ground that sewer easements were not an "integral part" of the treatment process and therefore, did not fall within the definition of "treatment works" in section 1292(2)(A). The district court distinguished Costle primarily on the ground that Costle focused on the question whether the EPA was required to fund the purchase, not, as here, on whether the EPA was authorized to fund the acquisition. Furthermore, the district court said that to the extent that the Fourth Circuit's opinion conflicted with the district court's own opinion it was unpersuasive, because the Fourth Circuit only addressed whether the purchase fell within the definition of "treatment works," not the question whether the purchase qualified under the term "construction." Id. at 1438. In the end, the district court concluded that since the EPA had the authority to grant the funds to the District, but was not required to do so, its attempt to reclaim the funds was plainly unlawful. Therefore, it enjoined the EPA from seeking to recover the grant from the District directly or by offset. Id. at 1439.
 
 
 9
 The EPA moved for reconsideration. In addition to alleging that the court had misconstrued the term "construction" in the Act, the agency argued for the first time that it had been "completely ignorant" of the mitigation land portion of the District's grant request until its final audit. The EPA argued that it "never meaningfully exercised discretion with respect to the mitigation land purchase, and [it] was entitled to exercise that discretion now." The court denied the EPA's motion for reconsideration, rejecting its claims of ignorance on the ground that the agency could not now rely on " 'post hoc reasoning, divulged for the first time in litigation, as the basis of its decision.' " The court also rejected the EPA's request to remand the case to the agency because the question was purely one of law and, under the circumstances, there was "nothing to remand." The court nevertheless said it was expressing no opinion as to whether the EPA could seek to recover the funds through administrative means "on the basis asserted in this motion."
 
 III. DISCUSSION
 
 10
 "It is elementary that '[t]he starting point in every case involving construction of a statute is the language itself.' " Southeastern Community College v. Davis, 442 U.S. 397, 405, 99 S.Ct. 2361, 2366, 60 L.Ed.2d 980 (1979) (quoting Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1975) (Powell, J., concurring)). The first step of statutory construction is to apply the plain meaning of the statute since there is a "strong presumption that Congress expresses its intent through the language it chooses." INS v. Cardoza-Fonseca, 480 U.S. 421, 432 n. 12, 107 S.Ct. 1207, 1213 n. 12, 94 L.Ed.2d 434 (1987). "[W]e look to the legislative history to determine only whether there is 'clearly expressed legislative intention' contrary to that language," id., and where there is not, "the language of the statute itself 'must ordinarily be regarded as conclusive.' " United States v. James, 478 U.S. 597, 606, 106 S.Ct. 3116, 3121, 92 L.Ed.2d 483 (1986) (quoting Consumer Product Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980)).
 
 
 11
 The Act provides that "[t]he Administrator is authorized to make grants to any State, municipality, or intermunicipal or interstate agency for the construction of publicly owned treatment works." 33 U.S.C. Sec. 1281(g)(1) (emphasis added). We agree with the district court that the definition of treatment works does not encompass the purchase of mitigation lands. To the contrary, it excludes such lands. As a result, the statute, properly construed, only permits "site acquisition of land that will be an integral part of the treatment process ... or is used for ultimate disposal of residues resulting from such treatment."[13] Accordingly, we agree with the Fourth Circuit that when the lands to be acquired do not constitute " 'integral' parts of the treatment process" (and are not used for the purpose of disposal), section 1281 does not authorize the EPA to fund their acquisition. Costle, 710 F.2d at 1014.
 
 
 12
 Here, the district court concluded that funding was not permitted under the definition of "treatment works," but then held that the EPA had the authority to authorize payments for mitigation wetlands under the definition of "construction." We disagree, for two reasons. First, we simply cannot read the word "construction," and more specifically the phrase "other necessary actions," as does the district court. Second, it is not enough for purposes of grant eligibility that a particular land acquisition falls within the definition of construction. Under the statute, the "construction" must be of "treatment works," not of some other aspect of a project.
 
 
 13
 As to the question whether mitigation land acquisition constitutes "construction," we start with the principle that we view the words of a statute in the context in which they appear. The definition set forth in section 1292(1) catalogues a list of activities deemed to constitute "construction."[14] The activities fall into three basic categories: planning and preparation, the actual building of the treatment works, and the inspection of the "foregoing items." The first category--planning and preparation--includes preliminary studies, structural or legal or financial investigations, and field testing of alternative water treatment processes and techniques. It is at the end of this listing, and before the description of the second and third categories, that the words "or other necessary actions" appear.[15]
 
 
 14
 Moreover, "[u]nder the rule of ejusdem generis, where general words follow an enumeration of specific terms, the general words are read as applying only to other items akin to those specifically enumerated." Harrison v. PPG Industries, Inc., 446 U.S. 578, 588, 100 S.Ct. 1889, 1895, 64 L.Ed.2d 525 (1980). See also Smith v. Davis, 323 U.S. 111, 117, 65 S.Ct. 157, 160, 89 L.Ed. 107 (1944) ("And, under the rule of ejusdem generis, it is reasonable to construe the general words 'other obligations' ... as referring only to obligations or securities of the same type as those specifically enumerated."); Bigelow v. Forrest, 9 Wall 339, 348-49, 19 L.Ed. 696 (1869) (the specific words, "followed by more general words, justifies the inference that the other trespasses and wrongs mentioned are trespasses and wrongs ejusdem generis, or of the same nature as those which has been previously specified"); 2A C. Sands, Sutherland on Statutory Construction Sec. 47.17, at 166 (4th ed. 1984) (ejusdem generis ). When considered in context, the phrase "other necessary actions" refers to actions which constitute a part of the planning and preparation stage, actions similar to those listed in the part of the statutory definition that precedes the use of the phrase. By adding the phrase, Congress made it plain that it did not intend to limit funding for preparation and planning to the specific activities listed in section 1292(1), and that the costs of other steps within that category were also eligible for grant reimbursement.
 
 
 15
 We do not consider the acquisition of mitigation lands to constitute planning or preparation activities, nor do we consider such acquisition to be "akin" to the specifically enumerated items that precede the phrase "other necessary actions." We arrive at this conclusion even though we recognize that the acquisition of mitigation wetlands is a necessary condition to the construction of the treatment works. In Costle, the City of Columbia sought reimbursement for the cost of acquiring easements necessary to the building of a sewer line to its new wastewater treatment facility. The Fourth Circuit stated that "[i]t is undisputed in the present case that the acquisition of the easements is a necessary incident to the construction of the sewer line, in that the line will run through people's property." Costle, 710 F.2d at 1013. Yet the court concluded that such an acquisition did not qualify for reimbursement under section 1281.[16] Similarly, while the mitigation wetlands must be acquired as a condition to constructing the treatment plant, the costs of such acquisition also do not qualify. Nothing in the statute suggests that "or other necessary actions" is to be given the all-expansive definition which would "encompass[ ] virtually every act related to the process of building a treatment works." 668 F.Supp. at 1434.
 
 
 16
 The district court relies on Garcia v. United States, 469 U.S. 70, 73, 105 S.Ct. 479, 481, 83 L.Ed.2d 472 (1984), for the proposition that the rule of ejusdem generis does not apply where terms are connected in the disjunctive by the conjunction "or." We disagree. Garcia discusses 18 U.S.C. section 2114, which prohibits assault with intent to rob "any person having lawful charge, control or custody of any mail matter or of any money or other property of the United States." The Court held that "the use of the term 'or' indicates an intent to give the nouns their separate, normal meanings." Id. at 73, 105 S.Ct. at 481. Clearly, there are two different types of statutes that use the conjunction "or," and we should not hastily apply the Garcia rule in every context. In the Garcia statute, "mail matter" and "money" are dissimilar objects. The phrase "other property" added to a list of dissimilar things indicates a Congressional intent to draft a broad and all-inclusive statute. In Garcia, the phrase "other property" was intended to be expansive, so that one who assaulted, with intent to rob, any person with charge, custody, or control of property of the United States would be subject to conviction under 18 U.S.C. section 2114. Where the list of objects that precedes the "or other" phrase is dissimilar, ejusdem generis does not apply. However, the statute at issue here falls into a different category. Because section 1292(1) presents a number of similar planning and preliminary activities linked together by the conjunction "or," the principle of ejusdem generis does apply. "[O]r other necessary actions" in the statute before us refers to actions of a similar nature to those set forth in the parts of the provision immediately preceding it. We have previously construed "or other" language that follows a string of similar acts and have concluded that the language in question was intended to be limited in scope--a similar conclusion to the one we reach today. In Nevada v. Herrington, 827 F.2d 1394, 1400 (9th Cir.1987), for example, we were required to interpret a provision of the Nuclear Waste Act which provided procedures for resolving a state's objections "through negotiation, arbitration, or other appropriate mechanisms." 42 U.S.C. Sec. 10137(c)(11). We followed the rule of ejusdem generis and held that " 'other appropriate mechanisms' would be limited to dispute resolution procedures similar in nature to negotiation and arbitration." Id. Here, likewise, we conclude that "other necessary actions" refers to other actions similar in nature to those that are listed in the part of the provision that precedes the disputed phrase. Accordingly, we conclude that the district court's analysis is in error.
 
 
 17
 Our second and primary reason for holding that we must reverse the district court's decision is that, even if the word "construction" is given an expansive reading, funding for mitigation wetlands would still be prohibited under the express language of the statute. Grants are permitted only for "the construction of publicly owned treatment works." 33 U.S.C. Sec. 1281(g)(1) (emphasis added). The quoted phrase must be read in its entirety. Funding is not permitted for construction in the abstract. In order to qualify for grant funding, the project must meet both parts of the definition; in other words, it must not only constitute "construction," but the construction in question must be of a "treatment works."As the district court properly found, mitigation wetlands clearly do not fall within the scope of the term "treatment works." Under the statute, "treatment works" encompasses "any works, including site acquisition of the land that will be an integral part of the treatment process (including land used for the storage of treated wastewater in land treatment systems prior to land application) or is used for ultimate disposal of residues resulting from such treatment." 33 U.S.C. Sec. 1292(2)(A) (emphasis added). Land with a different function or used for other purposes does not fall within the statutory definition. Clearly, mitigation wetlands are not an integral part of the treatment process and are not used for the ultimate disposal of the by-products of the treatment process. In fact, the function of wetlands is directly at odds with the purposes for which the lands falling within section 1292 must be used; wetlands are intended to provide a haven for wildlife free from any residue of wastewater treatment. Since even if the acquisition of wetlands constituted construction, the acquisition could not constitute construction of treatment works, section 1281 cannot be read as authorizing the EPA to make the grant at issue here.
 
 
 18
 As we stated earlier, the legislative history of the Act does not contradict the plain meaning of the statute. In fact, the available history supports the reading we have adopted.[17] In this case, as in Cardoza-Fonseca, 408 U.S. at 432, n. 12, 107 S.Ct. at 1213, n. 12, "far from causing us to question the conclusion that flows from the statutory language, the legislative history adds compelling support to our holding that Congress never intended" to consider the acquisition of mitigation wetlands "the construction of publicly owned treatment works." 33 U.S.C. Sec. 1281(g)(1).[18]
 
 
 19
 Because the district court decided the case based on an erroneous assumption that the statute permits grant funding for the costs of acquiring mitigation wetlands, it did not reach the issue of estoppel. We reverse the holding of the court below, but remand for further proceedings on the estoppel question and on such further issues as may properly be raised by either of the parties.
 
 
 20
 VACATED AND REMANDED FOR PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION.
 
 
 
 *
 Hon. Pierce Lively, United States Senior Circuit Judge for the Sixth Circuit, sitting by designation
 
 
 [1]
 With regard to the EPA's contractual obligation, section 1283(a) states:
 The Administrator shall act upon such plans, specifications, and estimates as soon as practicable after the same has been submitted, and his approval of any such plans, specifications, and estimates shall be deemed a contractual obligation of the United States for the payment of its proportional contribution to such project.
 
 
 [2]
 The EPA's regulations permit it, through its Regional Administrator, to delegate the authority for processing grants to state agencies. The EPA designated the State Board as its agent to manage the construction grants program in California, Sacramento Regional County Sanitation District v. Thomas, 668 F.Supp. 1427, 1429 (E.D.Cal.1987), and the conferral of agency authority is not disputed. Under the agreement between the EPA and the State Board, the Board reviews grant applications, makes a determination of eligibility, and transmits the materials to EPA for final approval. The State Board, however, has no power to award grants or commit EPA to award grants. EPA may approve, deny or defer the grant application. 40 C.F.R. Sec. 30.345. See Subpart F--State Management Assistance Grants, 40 C.F.R. Secs. 35.1030 to 35.1030-9 (1978)
 
 
 [3]
 Communications between the District and the State Board include the following: a December 14, 1979 letter from the District to the State Board discussing wetlands compensation area, and providing a map of most likely site; a January 28, 1980 letter from the District to the State Board providing the estimated cost for the wetlands compensation area; a March 19, 1980 letter from the District to the State Board providing revised configuration and cost estimates for wetlands compensation area; an April 24, 1980 letter from the District to the State Board requesting authorization to purchase lands identified in the March 9, 1980 letter, including wetlands compensation area, and noting that due to EPA's deferral of fiscal year 1980 grant funds, the District will not be able to secure a grant amendment to cover the costs of all eligible land purchases. The series of letters from the District to the agent of the EPA clearly communicated the intent of the District to use such funds to purchase mitigation wetlands
 
 
 [4]
 In this case, it appears that the land was not contiguous to the site of the wastewater treatment plant, and was, in fact, located some distance away from the plant site. However, the location of the land is immaterial to our decision. The funding would have been improper even had the land been contiguous
 
 
 [5]
 The EPA claims that it was unaware at that time that the amendment included a request for the reimbursement of the 110 mitigation acres. It claims that had the Agency known of this, it "would have questioned these costs as possibly outside the range of grant-eligible costs." Since this claim is part of the estoppel issue, it will be appropriate for the district court to consider its significance on remand
 
 
 [6]
 In the February 6, 1981 letter, the EPA stated that the acquisition of land is permitted "only if it will be an integral part of the treatment process, used for the ultimate disposal of residues resulting from such treatment, used for the storage of treated wastewater in land treatment systems before land application or used for composting or temporary storage of compost residues which result from wastewater treatment, if EPA has approved a program for such use.... Therefore, we must advise you that we cannot accept such costs as eligible and we ask that your office advise grantees accordingly."
 
 
 [7]
 In fact, the District did not receive a copy of the February 6, 1981 letter from the EPA until August 14, 1982. 668 F.Supp. at 1429 n. 2
 
 
 [8]
 40 C.F.R. Sec. 30.820(b) (1978) provides for final audits: "Any settlement made prior to the final audit is subject to adjustment based on the audit. Grantees and subcontractors of grantees shall preserve and make their records available under Sec. 30.805 [governing the procedure for record-keeping]."
 
 
 [9]
 "The term 'treatment works' means any devices and systems used in the storage, treatment, recycling, and reclamation of municipal sewage or industrial wastes of a liquid nature to implement section 1281 of this title, or necessary to recycle or reuse water at the most economical cost over the estimated life of the works, including intercepting sewers, outfall sewers, sewage collection systems, pumping, power, and other equipment, and their appurtenances; extensions, improvements, remodeling, additions, and alterations thereof; elements essential to provide a reliable recycled supply such as standby treatment units and clear well facilities; and any works, including site acquisition of the land that will be an integral part of the treatment process (including land used for the storage of treated waste-water in land treatment systems prior to land application) or is used for ultimate disposal of residues resulting from such treatment."
 33 U.S.C. Sec. 1292(2)(A).
 
 
 [10]
 "The term 'construction' means any one or more of the following: preliminary planning to determine the feasibility of treatment works, engineering, architectural, legal, fiscal, or economic investigations or studies, surveys, designs, plans, working drawings, specifications, procedures, or other necessary actions, erection, building, acquisition, alteration, remodeling, improvement, or extension of treatment works, or the inspection or supervision of any of the foregoing items."
 33 U.S.C. Sec. 1292(1) (emphasis added).
 
 
 [11]
 668 F.Supp. at 1434-36. In particular, the district court found of no significance the proposal and defeat of a broad amendment to the Act in 1981 that would have required the EPA to grant funds for adverse impact caused by treatment works construction including funds for mitigation purposes. The district court reasoned that the amendment in the narrow form as finally passed merely evidences an intent to mandate a mitigation grant for Eureka, California, but continues to accord the EPA the discretion to fund mitigation projects in general. We do not find this analysis to be persuasive. The determination to provide funding for Eureka alone suggests that Congress decided to let the EPA continue its policy of denying grants for mitigation purposes generally. See United States v. Clark, 454 U.S. 555, 564, 102 S.Ct. 805, 811, 70 L.Ed.2d 768 (1982) ("Congress' failure to correct [a] practice, if it did not correspond with congressional intent, at the very time Congress was revamping the laws applicable ... provides further evidence of its intent that [the status quo remain.]" However, as we explain later, like the district court, we conclude that the legislative history is not such as to overcome the plain meaning of the statute
 
 
 [12]
 668 F.Supp. at 1436-37. The court concluded that the EPA's regulations did not require a result inconsistent with the language of the statute and that these regulations were "largely incomprehensible." Id. at 1437
 
 
 [13]
 33 U.S.C. Sec. 1292(2)(A). For the statutory definition of "treatment works," see supra
 note 9.
 
 
 [14]
 For the statutory definition of "construction," see supra note 10
 
 
 [15]
 Had the phrase "or other necessary actions" been placed under an independent subheading separate from the other parts of the definition of "construction," or even had it appeared at the end of the definition after all three categories had been explored, the district court's reading might have been more plausible. Under those circumstances, it might have been possible to conclude that Congress intended to give the phrase a more expansive scope. However, its actual placement in the statute clearly indicates that the phrase permits governmental entities to engage in "other necessary actions" which are a part of or related to the planning and preparation aspect of the construction process
 
 
 [16]
 The district court distinguished Costle in part on the ground that "[i]t did not discuss the definition of 'construction,' which, as I explained above, is the key question." 668 F.Supp. at 1438. We have now examined at length the definition of "construction" and are not persuaded by the district court's analysis, or by its efforts to distinguish Costle. However, even if we agreed with the district court as to the meaning of "construction," we would still disagree with its ultimate conclusion. See infra discussion at 1269
 
 
 [17]
 In 1972, when Congress revisited the issue of funding for treatment works, it permitted "site acquisition ... that will be an integral part of the treatment process or ... used for ultimate disposal or residues." Pub.L. No. 92-500, Sec. 212(2)(A) (1972). The Report of the Senate Committee on Public Works accompanying the bill stated that "only those lands which physically interact with wastewater or pollutants removed therefrom" were included, while "[l]ands which are merely a site for the placement of buildings or equipment are not considered to be part of the treatment process and are not included in the cost of construction." Sen.Rpt. No. 414, 92nd Cong., 1st Sess. 40, reprinted in 1972 U.S.Code Cong. & Admin.News 3668. The 1977 amendments added the further layer of qualification that site acquisition includes "land used for the storage of treated wastewater in land treatment systems prior to application." Pub.L. No. 95-217, 91 Stat. 1579 (codified as amended at 33 U.S.C. Sec. 1292 (1977)). This definition of "treatment works" continues in the Act in its present form and, as stated above, is the only reference to land acquisitions in 33 U.S.C. Sec. 1292(2)(A). See also supra note 11
 
 
 [18]
 We have also reviewed the agency's interpretations of the statute, and find them internally inconsistent. In any event, the agency's interpretations would be insufficient to overcome the plain meaning of the statute. See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837, 842-43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984) ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.")